```
 1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
 2                    AT SEATTLE
   _____
 3
    UNITED STATES OF AMERICA,        )
 4                                   )
          Plaintiff,                 )   NO. CR12-001RSL
 5                                   )
    v.                               )   SEATTLE, WASHINGTON
 6                                   )   03/22/2013
    TIMOTHY DORAN,                   )
 7                                   )   EVIDENTIARY HEARING
          Defendant.                 )
 8                                   )
   _____
 9

10             VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT S. LASNIK
11              UNITED STATES DISTRICT JUDGE

12 _____

13  APPEARANCES:

14   For Plaintiff:         BRIAN D. WERNER
                            ANDREW C. FRIEDMAN
15                          United States Attorney's Office

16
     For Defendant          NICHOLAS WRIGHT MARCHI
17   TIMOTHY DORAN:         Carney & Marchi

18
     U.S. Probation:        BRIAN FACKLAM
19
     Interpreter:           PAUL TU
20

21

22

23

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.
```

EXAMINATION INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| NGOC TUAN HOANG | DIRECT EXAMINATION BY MR. WERNER | 12 |
| | REDIRECT EXAMINATION BY MR. WERNER | 40 |
| GIRLIE PINEDA | DIRECT EXAMINATION BY MR. WERNER | 43 |
| | CROSS-EXAMINATION BY MR. MARCHI | 51 |

EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| 1 | 19 |
| 11 | 21 |

PROCEEDINGS
_____

THE COURT:  Good morning.  Thank you.  Please be seated.

THE CLERK:  Case CR12-001L, United States versus Timothy Doran.

Counsel, would you please make your appearances?

MR. WERNER:  Good morning, Your Honor.  Brian Werner and Andrew Friedman on behalf of the United States.

THE COURT:  Hi, Mr. Werner and Mr. Friedman.

MR. MARCHI:  Good morning, Your Honor.  Nicholas Marchi on behalf of Mr. Doran.

THE COURT:  Hi, Mr. Doran, Mr. Marchi.  And we have Brian Facklam from U.S. Probation.

We are here for sentencing on Mr. Doran's plea of guilty to failure to register as a sex offender.  And I have received, in preparation for the sentencing today, Mr. Facklam's U.S. Probation presentence report.  I have the government's sentencing memorandum, with many attachments, and their revised sentencing memorandum.  I have Mr. Marchi's sentencing memorandum, with attachments, and supplemental sentencing memorandum, with attachments.  And I received a handwritten, or hand printed, letter to me from Mr. Doran, along with some pictures of his children.

So I know that is only the starting point for things

1    today.  But do I have everything that was filed from the

2    government?

3            MR. WERNER:  Yes, Your Honor.

4            THE COURT:  And, Mr. Marchi, from you?

5            MR. MARCHI:  Yes, Your Honor.  There was an exhibit

6    that was filed that I understand the court has marked as

7    Exhibit 500.

8            THE COURT: Yes.  Great.  Okay.  So we are going to

9    proceed then with the -- what is that?

10           THE CLERK:  Somebody must have their cell phone on.

11           THE COURT:  If you have a device that emits anything,

12   please shut it completely off, because that is what we are

13   picking up.  Don't just turn the sound off, but turn the

14   phone off, please.  That picks up the radio signal.

15       So, anyway, we are going to conduct an evidentiary

16   hearing.  And, Mr. Werner, how do you propose to proceed with

17   your presentation?  Or Mr. Friedman.  Sorry.

18           MR. FRIEDMAN:  Your Honor, we have had, I guess I

19   would say, a complication that I think probably affects how

20   we should proceed.  As the court knows, we have been working

21   for quite a while to try and get police officers here from

22   Vietnam.  We have run into a number of procedural roadblocks.

23       Eventually, about a month ago, it appeared that we were

24   likely to be able to do it.  But we still had not received

25   any reports from Vietnam.  We spoke to defense counsel and

1    explained that we saw two ways to proceed.  One would be to

2    push ahead, and we thought we would have the officer, and we

3    might have some reports, and if that happened, we thought the

4    officer -- basically, the way we would get them is the

5    officer would appear, hand them to us at the last moment, and

6    there would be no time for defense to prepare; alternately,

7    we could keep pursuing the reports and seek a continuance.

8        And we said we were fine with either and offered that

9    option.  My understanding is Mr. Doran elected to proceed

10   today.  And so we did get an officer here last night, who did

11   hand us 60 pages of Vietnamese documents at 8 p.m., which we

12   immediately sent to defense counsel.

13       As the court would guess, defense counsel wants time to

14   look at those.  And in one way, that is not entirely

15   unreasonable, because I'm not sure whose choice it was to go

16   forward today.

17       On the other hand, we have the officers here, and we spent

18   a considerable amount of money and difficulty getting them

19   here.  So we do not want to not have their testimony before

20   they leave for Vietnam.

21       So we have spoken with defense counsel.  And what we would

22   propose, if the court was willing, was to adjourn and conduct

23   a joint interview of the officers.  It would give defense

24   counsel a chance to hear what they have to say.  Reconvene at

25   1:30, when we would present their direct testimony.  Defense

 1   would presumably conduct a cross-examination.

 2       And to the extent they felt that wasn't adequate, we said

 3   we would try and facilitate a conference call, if the court

 4   wanted to allow more in the future, once the officers

 5   returned to Vietnam.  But we can't guarantee that would

 6   happen, because once they return, we have no idea what would

 7   happen.

 8       So that would be our proposal.  There is also one other

 9   witness who has had a difficult time getting here from

10   San Francisco, and we propose presenting her testimony this

11   afternoon also to the court.

12           THE COURT:  Okay.  Mr. Marchi.

13           MR. MARCHI:  Your Honor, that is correct.  One of the

14   concerns that we have -- and I should note that the court is

15   well aware that I have requested reports since I got on.  On

16   June 12, 2012, a discovery request was made, renewed on

17   August 14th.  I filed a formal request on August 23, 2012,

18   and again on October 19, 2012.

19       And we are in a situation where I haven't even spoken to

20   these officers.  I got 70 pages of reports that are in

21   Vietnamese.  The government contacted me last night at

22   9 o'clock and said, "This is what we've got.  They have

23   arrived."  We do need to interview them.  I may have to

24   preserve cross.  At this point, I can't go forward without

25   that.

1      In addition, Your Honor, we are probably going to ask for

2  a reset on the sentencing, because that will affect how we

3  present our case on this matter.  And Mr. Doran is entitled

4  to a right to see and have the reports and review them.

5      So I would concur with the government.  At least they are

6  here.  It can be productive.  We can interview them.  I

7  understand we have a court interpreter here to facilitate

8  that this morning.  And I would suggest that we do that and

9  then reconvene at 1:30 and see where we are at.

10          THE COURT:  It seems to make a lot of sense.  Let me

11  just say a couple of broad-brush things.  The crime we are

12  sentencing for here is a failure to register.  The case law

13  in the Ninth Circuit, I think, is clear that if the

14  government is seeking to ask for an aggravated sentence on

15  the basis of what happened in Vietnam, the burden of proof on

16  the government is not preponderance of the evidence, it's

17  clear and convincing evidence.

18      And *United States versus Fitch*, 659 F.3d 788, which is a

19  2011 case, is very informative to this process here, because

20  it involved a man who was convicted of nine counts of bank

21  fraud and two counts of fraudulent use of an access device,

22  where the sentencing hearing related to whether he killed his

23  wife, and by that means achieved the ability to drain her

24  bank accounts, use her cards, et cetera, and the like.

25      And so it is a very helpful case for this process of what

1    the law requires.  And it is clear that, while the ordinary

2    burden of proof at a sentencing hearing is preponderance of

3    the evidence, for this type of an event, of an uncharged

4    crime -- and there they didn't even ever find her body, but

5    they still went forward -- the burden of proof is clear and

6    convincing evidence.

7        And while the rules of evidence do not apply to a

8    sentencing hearing, there are procedural due process rights

9    that must be respected in terms of both the reliability of

10    the evidence, the fact that the defendant can testify or not

11    testify at the sentencing hearing, and if he chooses not to

12    say anything, his silence cannot be used against him, and

13    that there has to be procedural fairness in terms of his

14    ability to meaningfully confront some of the witnesses

15    against him.

16        And so those are just my broad-brush thoughts that I

17    wanted to let everyone here know.  That is the burden of

18    proof.  And, yes, Mr. Marchi has to have an opportunity to

19    interview these officers.  Based on that joint interview,

20    there may be reasons why he still can't go forward with

21    cross-examination.  But we can proceed with direct

22    examination.

23        It's a fluid situation.  Take the time this morning to do

24    what you need to do, and we will reconvene at 1:30, okay?

25            MR. WERNER:  Very good, Your Honor.

1    (Recess.)

2         THE COURT:  Thank you, please be seated.

3    So, Mr. Friedman and Mr. Werner, were you able to make use

4    of that time this morning?

5         MR. FRIEDMAN:  We were, Your Honor.  We spent

6    probably all of but about 20 minutes in a joint interview

7    with the Vietnamese officer and Mr. Marchi.

8    We have a tentative plan, which would be to call that

9    officer.  And then Mr. Marchi would -- I don't know if he

10   would plan to do some cross or hope to do some later or do

11   some and hope to do some later, if that's arrangeable.  And

12   we wouldn't object to him doing it two different times,

13   obviously.

14   The question there is:  Once the officer returns to

15   Vietnam, will it be arrangeable or not?  Obviously we can't

16   vouch for that.

17        THE COURT:  Sure.

18        MR. FRIEDMAN:  We have one other witness from

19   San Francisco, a woman named Girlie Pineda.  And so we would

20   like to call her also.  I think Mr. Marchi indicated he would

21   be able to do that cross.  And we would propose to release

22   our other witnesses until whatever day the court reschedules

23   the rest of sentencing.  I think this will take us to 4:00

24   anyway.

25        THE COURT:  Right.  And in terms of Ms. Pineda, does

1   she need an interpreter at all?

2           MR. FRIEDMAN:  She does not.

3           THE COURT:  Okay.  And where would the interpreter

4   like to be during the testimony of the Vietnamese

5   investigator?  Up here?  Down there?

6           THE CLERK:  He has to be up here.

7           INTERPRETER:  Well, with the equipment, Your Honor, I

8   can be anywhere.

9           THE COURT:  Well, we will have you up here, then,

10  with the witness.  And should we use a handheld mike, do you

11  think, or just have the interpreter have the microphone?

12          THE CLERK:  Yes.  I put another chair up there.

13          THE COURT:  Great.  Mr. Marchi.

14          MR. MARCHI:  Your Honor, just so the record is clear,

15  the government did allow me to begin my interview of the

16  officers.  We started at approximately 9:45.  We completed

17  it, I believe, at 12:50.

18      The government additionally had provided me with

19  additional documentation.  It is agreed, Your Honor, we will

20  allow the government to put on the witness.  However, at this

21  time, we are not prepared to go forward with any

22  cross-examination, given the amount of information that was

23  handed to us this morning.

24      And I think the government and I will make every effort to

25  make sure that we get a chance to progress on those

1  witnesses.  And I think the government and I can work on

2  that.

3      With regards to Ms. Pineda, Your Honor, understanding the

4  government having to fly this witness in, we will attempt to

5  cross-examine her and use her efficiently.  However, I would

6  reserve on possibly having her come back or testify via

7  telephone, if we can do it that way, just because of the

8  amount of information that I received today.

9          THE COURT:  Sure.  I think that is eminently

10  reasonable.  And, of course, hopefully we can set up a way to

11  continue the examination of the Vietnamese investigator from

12  afar.  But without meaningful cross-examination, I couldn't

13  allow the direct testimony to stand.  So it's going to be

14  essential that we set up cross-examination.  And I think the

15  government attorneys understand that.

16      So we are all doing the best we can under very difficult

17  circumstances.  But go ahead and call your witness, counsel.

18          MR. WERNER:  Your Honor, we call Ngoc Hoang to the

19  stand.

20          THE COURT:  How is his English?  Just like my

21  Vietnamese?

22          MR. WERNER:  I don't know.  It's better than my

23  Vietnamese.

24          THE COURT:  Okay.  Mr. Tu, would you please come up

25  with the investigator?

```
 1              INTERPRETER:  Yes, Your Honor.

 2              THE COURT:  If you both would stop right about there.

 3    Kerry, let me just ask them first.

 4       My name is Robert Lasnik.  I'm a United States District

 5    Court judge.  Thank you very much for appearing here.  My

 6    clerk will administer an oath to you to tell the truth.  And

 7    Mr. Tu will accompany you up here for your testimony.

 8       Okay.  Kerry.

 9       (Witness sworn.)

10              THE CLERK:  Please have a seat.  Please state your

11    full name and spell your last name for the court reporter.

12              THE WITNESS:  My full name is Ngoc, N-G-O-C, Tuan,

13    T-U-A-N, Hoang, H-O-A-N-G.

14              THE COURT:  Thank you, Mr. Hoang.

15       Go ahead, counsel.

16                        NGOC TUAN HOANG,

17    being first duly sworn, the witness was called and testified

18    through an interpreter as follows:

19                        DIRECT EXAMINATION

20    BY MR. WERNER:

21    Q   Mr. Hoang, where do you work?

22    A   I work for the investigative police department of the

23    Khanh Hoa office.  K-H-A-N-H H-O-A.

24    Q   What do you do for the Khanh Hoa Police Department?

25    A   I am the deputy officer of the Khanh Hoa Police Department
```

1    and also the supervisor investigator, criminal investigator.

2    Q    Mr. Hoang, how long have you worked for the Khanh Hoa

3    Police Department?

4    A    I worked there for 26 years.

5    Q    How long have you been a supervisor at the Khanh Hoa

6    Police Department?

7    A    I've been the supervisor since 2004.

8    Q    How many homicide investigations have you worked on during

9    your time at the Khanh Hoa Police Department?

10   A    Many.  I'm not sure, but around 50 or 60.

11   Q    Mr. Hoang, where is Khanh Hoa?

12   A    It's located in central Vietnam.

13   Q    How far is it away from Khanh Hoa to Ho Chi Minh City?

14   A    About 450 kilometers.

15   Q    What is the largest city in Khanh Hoa?

16   A    Nha Trang.  N-H-A T-R-A-N-G.

17   Q    Mr. Hoang, I want to direct your attention to March 13,

18   2011.  Do you remember your activities for the police

19   department on March 13, 2011?

20   A    Yes.

21   Q    Did you go to a residence with the address 9/1D1 Nguyen

22   Thien Thuat Street in Nha Trang on March 13, 2011?

23   A    Yes.

24   Q    Why did you go to that residence on Nguyen Thien Thuat

25   Street on that day?

14

```
 1   A    On that date, we were notified by the landlord of the
 2   house, Ms. Hong Nguyen, H-O-N-G N-G-U-Y-E-N, the owner of the
 3   address of 9/1D1 Nguyen Thien Thuat, notifying the police
 4   department, along with her husband, Quang Vo, Q-U-A-N-G V-O,
 5   that they had discovered a body at the house.
 6   Q    Were you, Mr. Hoang, one of the officers who went to the
 7   house on March 13, 2011?
 8   A    Yes.
 9   Q    How many floors were in that residence?
10   A    It had three floors.
11   Q    Did you find a dead body in that house?
12   A    Yes.
13   Q    How many dead bodies did you find?
14   A    One.
15   Q    Where did you observe that dead body?
16   A    It was located in a small room on top of the bathroom,
17   next to the bedroom on the second floor.
18   Q    How was the body covered?
19   A    It was rolled into a blanket and stuffed into the little
20   area.  The head was covered in a plastic bag, and it had tape
21   around the neck.
22   Q    What else could you observe about the body when you saw it
23   on March 13, 2011?
24   A    I don't understand the question.  Can you ask again?
25   Q    Did you smell the body when you went into the residence on
```

1    March 13, 2011?

2    A    The body was in a state of decomposition, and it had

3    deteriorated, with fluid coming out, and it smelled really

4    bad.

5    Q    Did you observe anything with the name Timothy or Tim in

6    that residence?

7    A    Yes.

8    Q    What?

9    A    Yes.  I found a plastic box with many business cards with

10   Timothy's name on it.  And, also, I found a cardboard box

11   with the name of Timothy Doran on it.

12   Q    Did you observe any children's items in that house?

13   A    Yes.

14   Q    What kind of children's items?

15   A    I saw children's bicycles and children's shoes.

16   Q    Were there children's books written in English in that

17   residence?

18   A    I saw a book in English, but I could not tell whether it

19   was for children or not.

20   Q    Did you take any fingerprints when you and the other

21   police were there at this residence?

22   A    Yes, we did lift fingerprints.

23   Q    From where?

24   A    We took fingerprints from a food box, from a book, and

25   from the staircase, and also from other places.

1    Q    What other places?

2    A    A bottle of water and a glass of water.

3    Q    Have you matched those fingerprints to anyone?

4    A    No.

5    Q    Have you attempted to match them to anyone?

6    A    No, because we did not have enough data to compare.

7    Q    You did not have enough data to compare the fingerprints

8    to anyone else?

9    A    That's correct.

10   Q    Does the Khanh Hoa Police Department have a copy of

11   Timothy Doran's fingerprints?

12   A    No.

13   Q    Did you find any blood, Mr. Hoang?

14   A    Yes.

15   Q    Where?

16   A    Blood on two pillows.

17   Q    Where were those pillows located?

18   A    It was on the bed, in the bedroom on the second floor.

19   Q    Did you take a DNA profile of that blood?

20   A    Yes.

21   Q    Did you match that DNA profile to anyone?

22   A    No.

23   Q    Does Vietnam have a DNA profile database?

24   A    No.

25   Q    Do you have a DNA profile for Timothy Doran?

1  A   No.

2  Q   Have you tried to match that blood to anyone else?

3  A   No, because at that time we didn't have any suspect.

4  Q   Mr. Hoang, did you observe any signs of a struggle at the

5  residence when you were there on March 13, 2011?

6  A   Yes, there was a sign of a struggle, because there was a

7  broken mirror from the dresser in the bedroom on the second

8  floor.

9  Q   Is that the same bedroom where you discovered blood on the

10 pillow?

11 A   Yes.

12 Q   Besides that --

13      THE COURT:  Counsel, could you just inquire about the

14 blood, whether there was an attempt to match it to the

15 victim's blood?

16 BY MR. WERNER:

17 Q   Mr. Hoang, have you attempted to match the blood found on

18 the pillow to the victim's blood?

19 A   Yes, we tried, but we were not successful.

20 Q   The DNA profile of the blood that you recovered in the

21 residence, did that tell you that that was a male's blood

22 that was recovered in the bedroom on the pillow?

23 A   Yes, it was a man's blood.

24 Q   Again, were there any other signs of a struggle that you

25 discovered in the residence on this day?

1    A    No, just a broken mirror.

2    Q    I want to ask you a few more questions about the body.

3    Did you observe the face of the body?

4    A    Yes.

5    Q    And, again, what was the state of the face on March 13,

6    2011.

7    A    It was in a stage of decomposition, and the eyes, the

8    lips, and the nose are getting decomposed.

9    Q    What else did a preliminary inspection of the body show

10   about any restraints that were placed on the victim?

11   A    Like I said earlier, the head was covered with a plastic

12   bag, with plastic taped around the chin and two tapes around

13   the neck.

14   Q    And you observed the body in that condition, the condition

15   you just described?

16   A    Yes.

17   Q    Who was the body identified to be?

18   A    Upon examination, we took the fingerprint of the body, and

19   we compared it with the fingerprint on the ID card.  And it

20   was the body of Ms. Nguyen Thi Bich Ngoc, N-G-U-Y-E-N T-H-I

21   B-I-C-H N-G-O-C.

22           MR. WERNER:  Mr. Interpreter, I believe there is a

23   binder of documents there before you.  Do you see that

24   binder?  Can you turn to Tab 1, please, and ask the witness

25   to look at Tab 1?

1  Q    I would ask the witness to look at Tab 1.

2  A    Yes.

3  Q    Sir, do you recognize the picture that has been marked as

4  Exhibit 1?

5  A    Yes, I do.

6  Q    Who is that?

7  A    Ms. Nguyen Thi Bich Ngoc.

8         MR. WERNER:  Offer Exhibit 1.

9         MR. MARCHI:  No objection, Your Honor.

10        THE COURT:  Exhibit 1 is admitted into evidence.

11     (Exhibit(s) 1 admitted.)

12  BY MR. WERNER:

13  Q    How tall was Ms. Bich Ngoc?

14  A    When we examined the body, we measured the length of body

15  to one meter, 43 centimeters.  But we don't know the

16  measurement when she was alive.

17  Q    How much did she weigh?

18  A    We did not measure the weight.  But I would guess she was

19  about 45 to 50 kilograms.

20  Q    Sir, can you also look at the exhibits marked as

21  Exhibit 11?  It's a very large stack of pictures.  I want to

22  ask, sir, do you recognize those pictures?

23  A    Yes.

24  Q    Can you flip through briefly and just familiarize yourself

25  with those pictures and tell us how you recognize them?

1          MR. WERNER:  And I warn anyone else flipping through

2    them, there are autopsy photos in there as well.

3    A    Yes, I recognize them all.

4    BY MR. WERNER:

5    Q    How do you recognize these photos?

6    A    I had arrived to this house to conduct the investigation.

7    Q    Are these photographs taken at the house we have been

8    describing on Nguyen Thien Thuat Street?

9    A    Yes.

10   Q    When were the photographs taken?

11   A    That was taken on March 13th and the morning of March 14,

12   2011.

13   Q    And, Mr. Hoang, approximately two-thirds of the way

14   through this stack of pictures, there are pages that appear

15   to depict a book.  Do you see that at the back of Exhibit 11?

16          MR. WERNER:  Your Honor, may I briefly approach the

17   witness to show what I am talking about?

18          THE COURT:  There look like there are numbers in the

19   lower right.

20          MR. WERNER:  For the record, I'm showing the witness

21   the pages that appear to depict two pictures per page, as

22   well as some writing.

23   Q    Can you look at that?

24   A    Yes.

25   Q    Do you see these photographs?

1    A    Yes.

2    Q    And they are numbered 1 through 70, correct?

3    A    Yes.

4    Q    And these again are also photos taken on March 13th and

5    March 14th in connection with this investigation, correct?

6    A    Yes.

7              MR. WERNER:  I offer Exhibit 11.

8              MR. MARCHI:  No objection, Your Honor.

9              THE COURT:  The pictures in Exhibit 11 are admitted

10    into evidence.

11        (Exhibit(s) 11 admitted.)

12    BY MR. WERNER:

13    Q    Mr. Hoang, can you look at the picture that is numbered --

14    well, let's start with No. 1.  What is depicted there in

15    Picture No. 1?

16    A    That's a picture of the house, of the address of 9/1.

17    Q    9/1?

18    A    9/1D1 Nguyen Thien Thuat.

19    Q    Mr. Hoang, will you look at the picture marked 35?

20    A    Yes.

21    Q    What is depicted in Picture 35?

22    A    That's a picture of the staircase going from the second

23    floor to the third floor right by the door of the little room

24    over the bathroom.  And in that little room is where we found

25    the body.

1    Q    Would you look at Picture 37?

2    A    Yes.

3    Q    What is depicted in 37?

4    A    The picture of the body that we had found.

5    Q    Does Exhibit 37 depict how the body looked when you

6    arrived on the scene on March 13th?

7    A    Yes.

8    Q    Who discovered the body?

9    A    That was Hong Ton, H-O-N-G T-O-N, and her husband, Quang

10   Vo, Q-U-A-N-G V-O.

11   Q    And did they move the body?  Did they tell you that they

12   moved the body before they called you?

13   A    No.

14   Q    If you would look at Picture No. 10?

15   A    Yes.

16   Q    In Picture No. 10, in the center, are those the cards that

17   you described earlier with Tim's name on them that you found

18   at the residence?

19   A    Yes.

20   Q    And if you look at Picture No. 11, is that another view of

21   the same cards?

22   A    Yes.

23   Q    Mr. Hoang, what happened with the body that was discovered

24   in Picture No. 37?

25   A    Because we observed that there was deterioration of the

1    body and that it had maggots on it and it had a really bad

2    smell, we moved it to the hospital, to the autopsy room.

3    Q    Was an autopsy conducted on the body that you found?

4    A    Yes.

5    Q    When was the autopsy conducted?

6    A    It was performed in the evening of March 13th.

7    Q    Are the pictures that are also included in this exhibit,

8    from about 45 through 70, are those pictures from the

9    autopsy?

10   A    Yes.

11   Q    What was the conclusion of the autopsy, as far as injuries

12   to this body?

13   A    From the exterior observation, there were markings, marks,

14   on the neck, and there was a broken bone on the side of the

15   neck.

16   Q    How many broken bones in the neck?

17   A    Both sides, two sides.

18   Q    I'm pointing to my neck now.  On both sides of the neck?

19   A    Yes.

20   Q    Mr. Hoang, besides the two broken bones, what other

21   injuries to the neck?

22   A    There was some bruises on the neck, and also there was a

23   tear in the vaginal area.

24   Q    I think you described bruises on the neck, and perhaps you

25   also said scratches on the neck.  Were both found on the

1    neck?

2    A    Yes.

3    Q    What did the autopsy determine the cause of death to be?

4    A    The conclusion was asphyxiation by strangulation.

5    Q    Were there any signs that the body had been beaten?

6    A    No.

7    Q    Would you expect to see signs of beating on this body?

8         MR. MARCHI:  Objection, Your Honor.  I don't think a

9    foundation has been laid for an opinion as to what was --

10        THE COURT:  The objection is sustained as to the form

11   of the question.

12   BY MR. WERNER:

13   Q    This body was deteriorated at the time of the autopsy,

14   correct?

15   A    Yes, it was in a stage of decomposition.

16        THE COURT:  I get it.  It's fine.

17   BY MR. WERNER:

18   Q    Did the autopsy determine a time of death?

19   A    It was eight days plus from the date of discovery of the

20   body.

21   Q    Was a toxicology report conducted on the deceased body?

22   A    Yes, we did, but we were not able to determine anything.

23   Q    So the toxicology results did not show anything as far as

24   alcohol or drugs in the body?

25   A    Yes, that's correct, because it has passed a long time,

```
 1  and the body has deteriorated.
 2  Q    Did you take statements, Mr. Hoang, in connection with
 3  your investigation?
 4  A    Yes.
 5  Q    Explain the process.  Who took those statements, and what
 6  type of people were interviewed in connection with this
 7  investigation?
 8  A    I have investigators who would take a statement from
 9  people who know about the situation.  And sometimes we have
10  them come to the office for that, or sometimes the
11  investigators would go to their house and take a statement.
12  Q    So did investigators working at your supervision take
13  statements in this case?
14  A    Yes.
15  Q    Did the police take a statement from a woman named Sa?
16  A    Yes.
17  Q    What is Sa's full name?
18  A    Nguyen Thikim Sa, N-G-U-Y-E-N T-H-I-K-I-M S-A.
19  Q    I will refer to this woman as Sa, just the name.  What did
20  Sa tell the investigators about this residence?
21  A    Sa is Ngoc's friend, N-G-O-C.  And on March 5th, at
22  midnight, they were out, Sa and Ngoc, together.  And Ngoc
23  received a call from Tim.  So Sa took a motorcycle and took
24  Ngoc from the cafe where they were to the house of 9/1D1
25  Nguyen Thien Thuat, because that's where Ngoc took care of
```

1   the children of Tim.

2   Q    Did Sa identify Ngoc as Ms. Ngoc Nguyen, the deceased

3   woman from the house?

4   A    Yes, that's correct.

5   Q    What did Sa say about the relationship between Timothy

6   Doran and Ngoc Nguyen?

7   A    Sa said that Ngoc lived with Timothy for a month before

8   her death, and many times Tim hit Ngoc and threatened to kill

9   her.

10  Q    What was the nature of their relationship, Ngoc and

11  Timothy Doran?

12  A    Boyfriend/girlfriend.

13  Q    And that's what Sa told the investigators?

14  A    That was from Sa and some other people.

15  Q    Did you also interview a woman named Le Nguyen?

16  A    Yes.  My investigator did the interview and made a report

17  to me.

18  Q    What is Le Nguyen's full name?

19  A    Nguyen Thi My Le, N-G-U-Y-E-N T-H-I M-Y L-E.

20  Q    If I call her Le Nguyen, will you understand who I'm

21  talking about?

22  A    Yes.

23  Q    What was Le Nguyen's relationship to Timothy Doran in that

24  residence?

25  A    Le Nguyen was the one who had the name on the rental

1    contract of that house, and she was the one who was taking

2    care of the two sons for Timothy.  And she left three weeks

3    before the incident because Timothy had been sexually

4    harassing her, so she left.

5    Q    Did Le Nguyen tell you who was living in the residence at

6    9/1D1?

7    A    Yes.

8    Q    Who was living there at the time of this incident, March

9    of 2011?

10    A    Timothy and the two young sons of Timothy.

11    Q    Did Le Nguyen tell the investigators that she spoke with

12    Mr. Doran after early March 2011?

13    A    Yes.

14    Q    Did they discuss an incident with Ngoc Nguyen, between

15    Mr. Doran and Ngoc Nguyen?

16    A    Yes.

17    Q    What did Le Nguyen say that Mr. Doran told her about an

18    incident between Mr. Doran and Ngoc Nguyen?

19    A    There was some email between her and Tim.  And then later

20    on there was some chat between her and Tim.  And Le Nguyen

21    asked him why did he kill Ngoc.  And Timothy said it was

22    unintentional and that they were arguing and he pushed Ngoc

23    and she fell onto the -- he pushed her onto the dresser, and

24    that's how she died.

25    Q    Did Le Nguyen give anything to the police?

1    A    Le Nguyen provided the printing of the emails between her

2    and Timothy.

3    Q    Did the investigators interview another woman named Nga

4    Thunga Trinh?

5    A    Yes.

6    Q    Again, what is her full name?

7    A    Trinh Thi Thunga, T-R-I-N-H T-H-I T-H-U-N-G-A.

8    Q    Nga, N-G-A, what was her relationship with Mr. Doran?

9    A    She was a teacher, and she wanted to learn English.  So

10   that's why she got to know Timothy.

11   Q    And did Nga, N-G-A, speak with Mr. Doran on or about March

12   5th, 6th, 7th, early March, 2011?

13   A    She talked with him on March 14th.

14   Q    What did she tell the police about the conversation she

15   had with Mr. Doran?

16   A    There was an email communication between Nga and Timothy,

17   and it was about Ngoc.  And Timothy told Nga that he did not

18   mean to kill Ngoc, it was just self-defense.

19   Q    Did Nga, N-G-A, provide emails to the investigators?

20   A    Yes.

21   Q    Mr. Hoang, could you please take the binder and turn to

22   Tab 12?

23   A    Yes.

24   Q    Mr. Hoang, there are a number of documents that have been

25   marked as Exhibit 12.  Would you take a look at these briefly

1   and confirm for us that these are reports that the Vietnamese

2   police provided to us yesterday?

3   A   Yes.

4   Q   You provided those to us last night, correct?

5   A   Yes.

6   Q   The first four pages of Exhibit 12, Pages 1, 2, 3, and 4,

7   that is a summary that you prepared, correct, Mr. Hoang?

8   A   Yes.

9   Q   All right.  Let's turn to the fifth page of Exhibit 12.

10  A   Yes.

11  Q   What is the fifth page of Exhibit 12?

12  A   That's the email communication between Nga and Timothy.

13  Q   That is between Nga, N-G-A, and Timothy?

14  A   Yes.

15  Q   This is the email communication that Nga provided to the

16  police that you described earlier?

17  A   Yes.

18  Q   And for the record, the page we just discussed, across the

19  top it says, "Had to to protect me & my boys," is that

20  correct?

21  A   Yes.

22  Q   And, again, that is the email that Nga provided the

23  police, correct?

24  A   Yes.

25  Q   The next page says, "i have told u the truth"?

```
 1    A    This is in English.  I don't understand it.

 2    Q    Do you see the numerals 3/17/11?

 3    A    Yes.

 4    Q    And is this page again a page that Ms. Nga, N-G-A,

 5    provided the police?

 6    A    Yes.

 7    Q    The next page with Ms. Nga's signature in the lower

 8    right-hand corner, is this also a page that was provided to

 9    the police?

10    A    Yes.

11    Q    The next page, it says, "Date."  Again, there's numerals,

12    12:32 p.m.  Is that also a page that Ms. Nga provided to

13    police?

14    A    Yes, that's correct.

15    Q    And could you turn a few more pages?  There is another

16    page with Ms. Nga's signature in the lower right-hand corner?

17    A    Yes.

18    Q    Do you see that page?

19    A    Yes.

20    Q    For the record, this is a page with 1-50 in the upper

21    left-hand corner?

22    A    Yes.

23    Q    This is another email that Ms. Nga, N-G-A, provided to the

24    police, correct?

25    A    Yes.
```

1    Q    And the pages that we didn't specifically identify, but we

2    just flipped through, between the last two sets of pages we

3    did identify, is that also email provided by Ms. Nga?

4    A    Yes.

5    Q    Would you turn to the next page, Mr. Hoang?  Do you see

6    the numbers in the upper left-hand corner of this next page,

7    10:51:55?

8    A    Yes.

9    Q    Do you recognize this?

10   A    Yes.

11   Q    What is it?

12   A    That's the email that Ms. Le, L-E, Nguyen, N-G-U-Y-E-N,

13   gave to the police.

14   Q    And the next three pages, are those also emails Ms. Le

15   Nguyen provided the police?

16   A    Yes.

17   Q    All right.  The next page has the same number, 10:51:55?

18   A    Yes.

19   Q    Is that another copy of emails that Le Nguyen provided to

20   the police?

21   A    Yes.  It's a chat page that Ms. Le gave to the police.

22   Q    And the next two pages after that --

23          THE COURT:  Could we stay on that page, counsel?

24          MR. WERNER:  Sure.

25          THE COURT:  There is something about Skype at the

1    bottom?

2          THE WITNESS:  Yes, it's handwritten, the word,

3    "Skype."

4          THE COURT:  Can you translate that for me?

5          THE INTERPRETER:  "This is the content of the chat

6    between Timothy and I though Skype."

7          THE WITNESS:  The person who submits this, the

8    signature.

9          THE COURT:  So this isn't really email.  This is what

10   Ms. Le wrote down based on her Skype conversation?

11         THE WITNESS:  It's a chat through electronic device,

12   where one person asks and then the other person answers.

13         THE COURT:  Okay.

14   BY MR. WERNER:

15   Q   So it is a computer printout of a chat, of some sort of

16   computer chat?

17   A   Yes.

18         THE COURT:  Okay.  Thank you.

19   BY MR. WERNER:

20   Q   And, sir, the next two pages, are they also chats that

21   were provided to the police by Le Nguyen?

22   A   Yes, that's correct.

23   Q   Thank you.  Did you also interview a woman named Hoang

24   Huong?

25   A   Yes.  Not me personally, but the investigators.

33

1    Q    And could you please say Hoang Huong's full name?

2    A    Hoang Vu Kieu Huong.  H-O-A-N-G V-U K-I-E-U H-U-O-N-G.

3    Q    And I will call her Huong.  Is that okay?

4    A    Yeah.

5    Q    What did Huong tell the police about her relationship to

6    Mr. Doran and this residence?

7    A    Huong was the one who worked for Timothy and took care of

8    the two children three weeks before the body was found.

9    According to Huong, it was three weeks before Timothy left.

10   Q    Did the police interview a Mr. Dat?

11   A    Yes.

12   Q    Can you give Mr. Dat's first name?  I might butcher it.

13   But a neighbor, did you interview a neighbor?

14   A    Yes.

15   Q    What is the neighbor's name, the male?

16   A    His name is Bui Tuan Dat.  B-U-I T-U-A-M D-A-T.

17   Q    What did Mr. Dat tell the investigators that he observed

18   at that location on March 6, 2011?

19   A    He said that he observed, at 2300 on March 6, 2011, he saw

20   Tim and his two sons close the door, got into a seven-seater

21   vehicle, and left.  For where, he did not know.

22   Q    What was the date and time when they left?

23   A    The 2300 hour of March 6, 2011.

24   Q    What did Mr. Dat see Mr. Doran carrying, if anything?

25   A    He just saw him close the door and then left.

1    Q    I want to go back and ask you one more question about

2    Ms. Huong.  Did Ms. Huong say who had keys to this residence

3    at 9/1D1?

4    A    She said only herself and Timothy had the keys.

5    Q    Again, Ms. Huong was taking care of the boys, correct?

6    A    Yes.

7    Q    You also interviewed a male by the name of Toan?

8    A    Yes, my investigators did.

9    Q    And what did Mr. Toan say -- well, what is Mr. Toan's full

10   name?

11   A    His full name is Nguyen Dinh Toan, N-G-U-Y-E-N D-I-N-H

12   T-O-A-N.

13   Q    And I will call him Toan, okay?  Will you know who I'm

14   talking about if I call him Toan?

15   A    Yes.

16   Q    Where did Mr. Toan say he worked?

17   A    He worked at the Quoc Te Hotel, Q-U-O-C T-E.  And it's

18   located also on Nguyen Thien Thuat Street.

19   Q    And did Mr. Toan say that he knew Timothy Doran?

20   A    Yes.

21   Q    Did they have a relationship where Mr. Doran would rent

22   scooters from Mr. Toan?

23   A    Yes, yes.  He would ask Toan to go and rent scooters from

24   somebody else.

25   Q    Did Mr. Toan tell the Vietnamese police about a situation

1   that he had with Mr. Doran on March 6, 2011?

2   A    Yes.

3   Q    And what did Mr. Toan say happened in that conversation?

4   A    Toan related that between 1300 and 1530 on March 6th he

5   received a lot of calls from Timothy into his phone.  And

6   later on he called back to Timothy, and Timothy told him that

7   somebody was threatening him, to kill him.  So Toan told

8   Timothy to call the police.  But then Timothy just hung up on

9   him.

10      And then about 1800 of the same day, Toan went to

11  Timothy's house.  And even though Timothy did not open the

12  door and let him in, he talked to Timothy.  And Timothy said

13  again that somebody threatened him.  And Toan said to go to

14  the police.  But Timothy didn't do anything.  And then Toan

15  just left.

16  Q    So Mr. Toan did not go inside the residence on March 6,

17  2011?

18  A    No.

19  Q    Did Mr. Toan say if he saw Ngoc Nguyen when he was at the

20  residence on March 6, 2011?

21  A    No.

22  Q    Did he say he did not see her?

23  A    He said he was standing outside and he saw Timothy and the

24  two children and nobody else.

25  Q    Did you also take a statement from a woman named Trang Thi

1    Hong Le?

2    A    Yes.  Her name is Le Thi Hong Trang.

3    Q    Could you spell that name, please?

4    A    L-E H-O-N-G T-H-I T-R-U-O-N-G.  Correction.  The name is

5    Trang, T-R-A-N-G.

6    Q    I'm going to call her Ms. Trang.  Will you know who I'm

7    speaking about if I say Ms. Trang?

8    A    Yes.

9    Q    What did Ms. Trang tell your investigators about her

10    relationship with Mr. Doran?

11    A    She knew Timothy through a friend, and they lived together

12    at the address of 258/12 Gia Tuong Street, G-I-A T-U-O-N-G,

13    from May of 2010 until September of 2010.  But during this

14    time, she said that Tim threatened her, threatened to hit her

15    many times.  So that's when she moved out, September 2010.

16        And she was aware of what had happened.  So in June

17    of 2011, she did some email and chat with Timothy, and she

18    asked Timothy, "Why did you kill Ngoc?  Don't you have a

19    conscience?  Don't you think that she would come back at

20    night when you dream, have nightmares about her?"

21        And Timothy said that he did not intentionally want to

22    kill her, but that they were struggling and they were arguing

23    and he pushed her onto the mirror and the mirror cut her

24    face, and that's how she died.

25        And then Trang said, "You lie, because there was no cut on

1    her face after the police performed the autopsy." She said

2    she saw the face, and there was no cut. And that's when

3    Timothy hung up.

4              THE COURT: Counsel, are you just about done?

5              MR. WERNER: I would want to clear it with the team

6    here, but, yes, I am about done.

7              THE COURT: Okay. Well, let's take about a

8    ten-minute break. We'll start up again at ten after 3:00.

9    Then we'll give Mr. Marchi a chance to ask some questions,

10   okay?

11      (Brief recess.)

12             THE COURT: Thank you. Please be seated.

13   Mr. Werner.

14             MR. WERNER: Thank you.

15   Q   Mr. Hoang, you had testified, I believe, that someone had

16   told the police that Ngoc Nguyen, the body who was found in

17   the house, took care of Timothy Doran's children. Is there

18   any evidence in your investigation that it was Ngoc Nguyen

19   who was taking care of Mr. Doran's children?

20   A   Ngoc Nguyen was actually the one who moved in and lived

21   there with Timothy. The person who took care of the child at

22   that time was Ms. Huong, H-U-O-N-G. But Ms. Huong just took

23   care of them during the day. Then she went home at night.

24   Q   And what was the evidence that you gathered in your

25   investigation that showed that Ms. Ngoc Nguyen lived at this

1   residence, at 9/1D1?

2   A    That was through the statement of Ms. Sa, S-A, who said

3   that she took Ms. Ngoc to that house on March 5, 2011.

4   Q    And Ms. Sa also stated that there was a prior relationship

5   that was going on between Mr. Doran and Ms. Ngoc Nguyen prior

6   to March 5, 2011?

7   A    Yes, March 5th, yes.

8   Q    And Ms. Sa told you that they had been in a relationship

9   prior to that date, right?

10  A    Yes.

11  Q    Did you investigate any connection to organized crime in

12  this case?

13  A    There is nothing like that to investigate.

14  Q    Is there an organized crime presence in Nha Trang?

15  A    No.

16  Q    Did anyone tell you in your investigation, or any of your

17  investigators, that Ms. Ngoc Nguyen was tied to organized

18  crime?

19  A    No.

20          MR. WERNER:  No further questions.  Thank you,

21  Mr. Hoang.

22          THE COURT:  Mr. Marchi, questions for the

23  investigator?

24          MR. MARCHI:  Your Honor, as I indicated earlier,

25  before we started, I would like to reserve.  Given the amount

```
 1    of information we were given this morning and the information

 2    that I've gotten this afternoon, we are not prepared to go

 3    forward with cross-examination at this time.

 4            THE COURT:  Well, I understand that you are probably

 5    not prepared to go forward with the full examination.  But

 6    aren't there some questions you would want to ask at this

 7    time?

 8            MR. MARCHI:  Not at this time, Your Honor.

 9            THE COURT:  Okay.  You have the opportunity, as long

10    as you know that.

11            MR. MARCHI:  I understand that, Your Honor.  And as I

12    indicated, given the information we have, I want to be

13    prepared and make it a useful cross-examination.

14            THE COURT:  All right.  May I please ask, did the

15    victim in this case have any criminal history or criminal

16    record of any kind?

17            THE WITNESS:  No.

18            THE COURT:  And I noticed that a request was made

19    through Interpol for DNA or fingerprints of Mr. Doran.  Has

20    there been any response to that?

21            THE WITNESS:  No.

22            THE COURT:  All right.  Thanks, counsel.  Anything

23    else, counsel?

24            MR. WERNER:  Your Honor, I think he knows, but I want

25    to ask.
```

```
 1                     REDIRECT EXAMINATION
 2   BY MR. WERNER:
 3   Q   Where does your investigation show Ms. Ngoc Nguyen was
 4   employed?
 5   A   She worked as a hairdresser at a hair salon at the address
 6   of No. 8 Biet Thu Street, B-I-E-T T-H-U, in Nha Trang.
 7   Q   And, sir, was yesterday at about 5:00 p.m. the first time
 8   you met with anyone from my office, the United States
 9   Attorney's Office, about this case?
10   A   Yes.
11   Q   And was yesterday at approximately 5 p.m. and into the
12   evening the first time you gave copies of your report to
13   my office as it relates to this case?
14   A   Yes.
15            MR. WERNER:  No further questions.
16            THE COURT:  Thank you very much, Mr. Hoang.  We
17   really appreciate it.
18      Thank you, Mr. Tu.
19            INTERPRETER:  Thank you, Your Honor.
20            THE COURT:  Mr. Werner, do you have another witness
21   ready to go?
22            MR. WERNER:  We do, Your Honor.  We call Girlie
23   Pineda to the stand.
24            THE COURT:  Mr. Werner, while we are waiting, is
25   there any ability to get DNA or fingerprint evidence to the
```

1   Vietnamese investigators?

2          MR. WERNER:  My understanding is certainly

3   fingerprint evidence can be.  With just a print, they can

4   give that to Vietnam, no problem.  The problem comes with the

5   DNA.  I think Mr. Doran's DNA has been typed in America, in

6   our system, and it's been typed in Vietnam.  Those systems, I

7   have been told, don't match.  They want different points of

8   data than we want in this system.  So something else would

9   have to be done to get that DNA to match.

10          THE COURT:  I see.

11          MR. FRIEDMAN:  And, Your Honor, for the record, we

12   have provided fingerprints today.  And Deputy Stephenson is

13   looking to see if there's anything that can be done on the

14   DNA -- or on the blood, sort of outside the Interpol channel.

15   Just give it directly to them.

16          THE COURT:  And then what do we know about the

17   ability to possibly have Mr. Hoang testify some more by

18   telephone, by Skype, by some other method?

19          MR. FRIEDMAN:  We don't really know anything.  We

20   find that when we -- Deputy Stephenson will be on board with

21   this one.  When we go through the Department of Justice, we

22   don't get very far.

23      But I think that if we just work through Interpol, my

24   guess is things may work much more smoothly.  Because we

25   don't need international travel, we can try it that way.  So

1    I'm optimistic, but I don't know.

2              THE COURT:  Okay.  Great.

3        All right.  Ms. Pineda, would you come forward, please?

4              MR. WERNER:  Your Honor, we have a request.

5    Ms. Pineda is very nervous about this process and was

6    wondering if Ms. Lee from our victim witness office could sit

7    up next to her?

8              THE COURT:  Oh, sure.  Come on up.

9        Ms. Pineda, follow Ms. Lee around here, and my clerk is

10   going to give an oath to you.  All right.  Just relax.  Right

11   there is good enough.  She is going to ask you to raise your

12   right hand, and she is going to administer an oath to you to

13   tell the truth, okay?

14       (Witness sworn.)

15             THE CLERK:  Please take the stand.

16             THE COURT:  Ms. Pineda, I have known Debbie Lee for

17   like 33 years.  She knows I'm not scary at all.  And I know

18   the process is a little intimidating.  But just have a

19   conversation.  That's all we are interested in, is for you to

20   tell us what you know.  And you are not in any danger, so

21   just take a deep breath.  Kerry is going to give you some

22   water.  And if you have any questions, just turn to me and

23   say you don't understand or you have a question, okay?

24             THE WITNESS:  Yes, sir.

25             THE CLERK:  Please state your full name and spell

```
 1   your last name for the court reporter.

 2           THE WITNESS:  My name is Girlie Pineda.

 3           THE COURT:  Could you spell your last name?

 4           THE WITNESS:  Oh.  P-I-N-E-D-A.

 5           THE COURT:  Great.  Thank you so much, Ms. Pineda.

 6      Go ahead, counsel.

 7                         GIRLIE PINEDA,

 8   being first duly sworn, the witness was called and testified

 9   as follows:

10                    DIRECT EXAMINATION

11   BY MR. WERNER:

12   Q   Ms. Pineda, what city do you live in?

13   A   San Francisco, California.

14   Q   How long have you lived in San Francisco?

15   A   Almost three years.

16   Q   Where are you from originally?

17   A   Philippines.

18   Q   Do you know the defendant, Timothy Doran?

19   A   Yes.

20   Q   How do you know him?

21   A   I met him through Internet, in a dating site,

22   philippino.com.  That's all how it started.

23   Q   When was that?

24   A   That was June.

25   Q   June of what year?
```

1  A    2011.

2  Q    And when did you first meet Mr. Doran face to face?

3  A    At the end of June of 2011, when they moved to

4  San Francisco from Seattle.

5  Q    Who else moved with Mr. Doran from --

6  A    With --

7  Q    Sorry.  Wait until I'm done with my question.

8       Who else moved with Mr. Doran to San Francisco?

9  A    With his two kids.

10 Q    Are his kids boys?

11 A    Two boys.

12 Q    About how old were they?

13 A    At that time, they were three and four.

14 Q    They were three and four?

15 A    Yes.

16 Q    And after Mr. Doran and his two sons moved to

17 San Francisco, where did they live?

18 A    We moved to my friend's house, who I call my Auntie.  We

19 lived there.  And then he went and got -- he get -- he got a

20 job in North Dakota.  That's why he left us there in

21 San Francisco.

22 Q    So, again, Mr. Doran moved to North Dakota for a job, is

23 that right?

24 A    Yeah, he got a job there.

25 Q    Did Mr. Doran's sons move with him to North Dakota?

```
1   A    No.  They are with me.

2   Q    They stayed with you, correct?

3   A    Yes.

4   Q    How long was Mr. Doran in North Dakota?

5   A    July, August -- July, August, and September, middle of

6   September.  I'm not sure about September.  Yeah, he was still

7   working in September.

8   Q    And during that time, he left his two kids with you?

9   A    Yes.

10  Q    Ms. Pineda, did you see Mr. Doran in September of 2011?

11  A    Yes.

12  Q    What happened then?  When did you see him?

13  A    That was the end of September I saw him.

14  Q    Did you see him in California?

15  A    No, in Seattle, over in Washington, when he take us to

16  Spokane, Washington.

17  Q    Did you move to Spokane, Washington, from San Francisco,

18  California?

19  A    No.  We moved there from Auburn.  We moved to Spokane, to

20  his friend's house.

21  Q    And this is September 2011?

22  A    Yeah, the end of the month of September.

23  Q    You moved --

24           THE COURT:  When did you go from San Francisco to

25  Auburn?
```

```
 1              THE WITNESS:  That was August, after our vacation.
 2    That was the middle of August.  And then we decided to go
 3    back to Seattle.  And we moved there to his sister's house
 4    for only two weeks, until we got an apartment in Auburn,
 5    close to his sister's house.
 6              THE COURT:  And how long were you in Auburn before
 7    you went to Spokane?
 8              THE WITNESS:  Like a month, September -- we rented
 9    that apartment like a month, the month of September until the
10    end of the month.
11              THE COURT:  Okay.
12    BY MR. WERNER:
13    Q    And as you lived in the state of Washington, where was
14    Mr. Doran?
15    A    He's in the -- he's in North Dakota.  He working there.
16    Q    After you moved to Washington, and after Mr. Doran went
17    back to North Dakota, did there come another time when you
18    saw Mr. Doran in Montana?
19    A    I saw him in Montana that September, too, end of
20    September.
21    Q    End of September, 2011?
22    A    Yeah, I think.
23    Q    Why did you meet him in Montana?
24    A    Because that one night he -- I got a lot of missed calls
25    from him.  And when I called him back, he told me he was in
```

1    the middle of running and was just looking for a safe place

2    for him.  And I don't have an idea of what is going on that

3    time.  So until he found -- he told me he is going to tell me

4    what happened when he got a safe place for him.  He went --

5    he checked into a motel there in Montana.

6    Q    Let me stop you right there.  When you say "there," he was

7    checking into a motel in Montana?

8    A    Yeah.  We met him in a motel in Montana.

9    Q    And the phone call you described, where were you when you

10   received that phone call?

11   A    We were in an apartment in Auburn.

12   Q    In Auburn.  So you drove from Auburn to Montana to meet

13   Mr. Doran?

14   A    Yes.

15   Q    And who went with you?

16   A    His sister.

17   Q    And who else?

18   A    And the two kids.

19   Q    And then you spoke with Mr. Doran in this hotel in

20   Montana?

21   A    Yes.

22   Q    And what did he tell you?

23   A    He tell me the story, the story of what happened there in

24   Vietnam, his version.

25   Q    What was his version?  What did he tell you in that hotel?

```
 1  A    His version is, this lady -- he dated this young lady for
 2  a short time.
 3  Q    Can I stop you?  Did he say what the lady's name was?
 4  A    Ngoc.
 5  Q    Do you know how to spell that?
 6  A    N-G-O-C.
 7  Q    Okay.  What else did he tell you?  He said he was dating a
 8  lady named Ngoc?
 9  A    For a short time.  And --
10  Q    What -- go ahead, please.
11       THE COURT:  Let her talk.  Go ahead.
12  A    And he told me this lady get mad, so mad at him because
13  he -- he -- he told the lady he was going to marry -- no,
14  he's going to bring her here to America to marry, and that's
15  why she gets mad at him, because he's not going to do the
16  promise.  And he gets tired of this lady asking him, "When
17  you going to bring me to America?"  And that's why he does --
18  I think they broke up on that.
19       And then the lady was in a gang, something like that.  And
20  the lady's with a gang.  That's what he told me.  And the
21  middle of the night they were sleeping, the two boys and him.
22  And they came inside the house, because the lady has the key
23  of the house.
24       She was with the two guys with -- you know, the two men
25  with her.  And they're trying to -- he told me they're trying
```

1    to kill him.  So he does this to defend himself with these

2    people, because these people want to get his two kids and

3    send them to China.  That's what he told me.  That's why he

4    defend himself.  He killed these people.

5    Q    Who did he tell you he killed?

6    A    I'm sorry?

7    Q    Who did Mr. Doran tell you that he had killed?

8    A    I'm confused.

9              THE COURT:  You said that he was telling you the

10   story that these gang members came in along with the woman

11   and he had to defend himself, so he killed them.  Who did he

12   mean when he said he killed them?  Did he kill the gang

13   members, the woman, all of them?

14             THE WITNESS:  Yeah, he told me he killed them.

15   That's it.

16             THE COURT:  He said he killed them?

17             THE WITNESS:  That's it.  He didn't say anything.

18   Just killed them just to defend himself for his two boys.

19             THE COURT:  Because they were going to take the boys

20   and sell them to China?

21             THE WITNESS:  Yeah, that's what he told me.

22   BY MR. WERNER:

23   Q    Did you speak with his sons about Ngoc?

24   A    Yeah.  One time I was so confused of what happened.  And

25   then I know it's not right to ask a boy, a five-year-old boy.

1          THE COURT:  Right.  Let's not even go into that.

2          THE WITNESS:  Yeah, I know, I know.  But at that

3    time, sir, I was so confused, and I just want to know what is

4    -- and also, besides that, I read the articles on the

5    Internet, too, his version and the version of the article.

6          THE COURT:  Sure.

7          THE WITNESS:  So I decided to ask the boy.

8    BY MR. WERNER:

9    Q    Okay.  And I'm not going to ask you about what the boy

10   said to you.

11   A    Okay.

12   Q    This is September 2011, when you had this conversation in

13   Montana, correct?

14   A    Yes, sir.

15   Q    Is there anything else that Mr. Doran told you about what

16   happened in Vietnam with Ngoc that you have not described in

17   the conversation?

18   A    He just told me he killed them.  That's it.

19   Q    What did you do?  Did you stay with Mr. Doran's children

20   for the next couple of months?

21   A    Yes.

22   Q    Where did you move?  Did you move at this time, at the end

23   of September, 2011?

24   A    Yeah.  We moved to Spokane.  We lived there for a month.

25   That was October 2011.  We lived there.  And after that, we

1    moved back to San Francisco.

2    Q    And did you stop living with Mr. Doran and his sons at a

3    certain point?

4    A    Yes.  That was December, the first week of December.

5    Q    And from the end of September to the first week of

6    December, you stayed with Mr. Doran and his two sons?

7    A    Yes.

8    Q    Mr. Doran didn't go back to North Dakota during this time?

9    A    No.

10   Q    And what was your relationship with Mr. Doran?

11   A    At first, I thought we had relationship.  But I just don't

12   -- I just don't know really what exactly what we have.  It is

13   confusing to me.  But all I know, I'm his girlfriend, and we

14   have a relationship, at first.  But then later on, I just

15   notice something like he is only using me for taking care of

16   the kids, that's it.

17           MR. WERNER:  Nothing further, Your Honor.

18           THE COURT:  Mr. Marchi, the other lawyer, will have

19   some questions for you also.

20       Mr. Marchi.

21           MR. MARCHI:  Thank you, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. MARCHI:

24   Q    Good afternoon, Ms. Pineda.

25   A    Good afternoon, sir.

```
 1    Q    Now, Ms. Pineda, you currently live in San Francisco,

 2    correct?

 3    A    Yes, sir.

 4    Q    All right.  And you met Mr. Doran back in June of 2011?

 5    A    Yes, sir.

 6    Q    And you said that you met him through the Internet?

 7    A    Yes, sir.

 8    Q    How long did you correspond with him over the Internet

 9    until you personally met with him?

10    A    Only one month.

11    Q    So you personally met him then in July?

12    A    Yeah.  We met at the end of the month of June.  And then

13    we've been together -- we started being together in July.

14    Q    Now, did Mr. Doran come down to live in San Francisco in

15    July?

16    A    Yes.  But that July, when they moved to San Francisco,

17    he's trying to find a job there.  But it's so hard for him to

18    look for a job there, until he got offered a job in North

19    Dakota.  So that's why he leaves his kids with me.

20    Q    Okay.  So he came in July to try to find a job, correct?

21    A    (Nods head.)

22    Q    I need you to say yes or no for me.

23    A    Oh.  Yes, sir.  Sorry.

24    Q    Thank you.  And then he couldn't find a job in

25    San Francisco, correct?
```

1           THE COURT:  That's right.

2   A   Yes, sir.

3           THE COURT:  That's what she said already.

4   BY MR. MARCHI:

5   Q   And then he moved to North Dakota?

6           THE COURT:  That's what she said.

7   BY MR. MARCHI:

8   Q   All right.  And you stayed in San Francisco with the kids,

9   right?

10  A   Yes, sir.

11  Q   All right.  How long was he in North Dakota working?

12  A   I think July until September.

13  Q   Okay.  And did he ever come back and visit the kids during

14  that period of time?

15  A   Yes.  That was August, the middle of August.  We had

16  vacation.  And then after that, we...

17  Q   Okay.  And then you moved up to Washington, to Auburn,

18  correct, in September?

19          THE COURT:  First Seattle, then to Auburn, where his

20  sister lives.

21  BY MR. MARCHI:

22  Q   All right.  What sister were you living with when you

23  first came to Seattle?

24  A   What?

25          THE COURT:  Tim's sister, what was her name?

```
1    A    Catherine Doran.

2    BY MR. MARCHI:

3    Q    And how long did you stay with Catherine?

4    A    We stayed there for two weeks, until we got an apartment

5    close to her house.

6    Q    All right.  And that was the Auburn apartment?

7    A    Yes.

8    Q    Okay.  And then you moved to Spokane, correct?

9    A    Yes, sir.

10   Q    When you were renting these apartments, was Mr. Doran

11   doing the renting of the apartments?

12   A    Her sister -- under his sister's name.

13   Q    All right.  Who rented the place in Spokane?

14   A    We're not renting a place there.  We just moved to his

15   friend's house.

16   Q    How long were you in Spokane?

17   A    A month.

18   Q    Do you remember the month?

19   A    October.

20   Q    Okay.  From July, when you moved in with Mr. Doran, did he

21   ever discuss what happened in Vietnam?

22   A    No.  I just know that that happened, that there was a --

23   what is the -- I am confused.  I just know -- are you asking

24   me about what --

25   Q    I'm asking you, when you were with Mr. Doran, when you
```

55

1  moved in with him in July down in San Francisco, okay?

2  A    Yes.

3  Q    And then until October, when you lived in Spokane, did he

4  ever discuss what happened in Vietnam during those months?

5  A    Yeah, he told me.

6  Q    He told you then?

7  A    Uh-huh.

8  Q    What did he tell you about what happened in Vietnam?

9  A    He just defend himself from these people.  That's why he

10  killed them.

11  Q    So when he told you that, was that before you said he told

12  you about it in Montana?

13  A    Yes.

14  Q    And then at some point you went and saw him in Montana?

15  A    I saw him in Montana.  We meet him there.

16  Q    Do you remember the month of that?

17  A    That was end of September.

18  Q    End of September.  Okay.  And you traveled all the way

19  from Auburn to Montana?

20  A    Yes, sir.

21  Q    Do you remember what city in Montana?

22  A    I don't remember the place, just the state.  That's it.

23  Q    Just the state?

24  A    Yes.

25  Q    No idea what hotel or anything like that?

1    A    I don't remember the hotel.

2    Q    How long were you in Montana?

3    A    Oh, we stayed there, like, I think, overnight.

4    Q    Overnight?

5    A    Uh-huh.  And we left the hotel in the morning -- in the

6    afternoon.

7    Q    And who else was with you when you went to Montana?  You

8    said his sister?

9    A    His sister.

10   Q    What sister was that?

11   A    His older sister.

12   Q    What was the sister's name?

13   A    Catherine Doran.

14   Q    Now, it was at the motel that Mr. Doran told you that he

15   killed people, correct?

16   A    Yes.

17   Q    Who was in the room?

18   A    The room?

19   Q    Well, let me strike that.

20        Where did he tell you he did this?

21   A    Oh, in the motel room.

22   Q    Okay.  In the motel room.  Was anybody else in the room?

23   A    Only me, him, and his sister, and the kids.

24   Q    So everybody was in the same motel room?

25   A    Yes.

1    Q    And so the kids were there, the sister Catherine was

2    there, you and Mr. Doran?

3    A    Yes, sir.

4    Q    And he told you that he had killed several people in

5    Vietnam?

6    A    Yes, sir.

7    Q    Now, you said you also looked up on the Internet what

8    happened?

9    A    When they told me about their version, I was having a

10   doubt in my mind.

11   Q    Okay.

12   A    And then I just had a chance to open my laptop.  And I

13   Googled his name, because I'm so curious what happened and

14   then how these people look for him in North Dakota and how

15   did they find out that he's here.  And that's why I got doubt

16   and wonder what happened.

17   Q    When you looked on Google --

18   A    I typed, "Tim Doran, Vietnam."

19   Q    Okay.  That was after Mr. Doran told you in September?

20   A    Yes, after.

21   Q    Okay.  And did you ever ask Mr. Doran about the Internet

22   articles?

23   A    I asked him.  He told me, "Don't believe it.  They're just

24   making some different story."

25   Q    Did you ever discuss it with Catherine?

1    A    Yes.  I told her that night.

2    Q    And what did she say to you?

3    A    She told me the same story with what he told me.

4    Q    And what was that?

5    A    The gang there and the guy with the lady.

6    Q    So Catherine told you the same story, that a lady came in

7    the house with another guy?

8    A    Yes, sir.

9    Q    And it's gang members?  Am I hearing that?

10   A    Well, that's what he says, it's a gang, a member of a

11   gang.

12   Q    A gang, not a gun?

13   A    Yes.

14        THE COURT:  Yes.

15   BY MR. MARCHI:

16   Q    Okay.  When was the last time you saw Mr. Doran?

17   A    That was December, the first week of December.

18   Q    The first week of December?

19   A    2011.

20   Q    And where did you last see him?

21   A    I'm sorry?

22   Q    Where did you last see him?

23   A    Oh, where?  In the hotel that we rented in San Francisco.

24   Q    Okay.  So it was down in San Francisco?

25   A    Yes, sir.

59

1    Q    At some point, were you interviewed by the police in

2    December?

3    A    Yes.

4    Q    And do you remember who interviewed you?

5    A    Yeah, the U.S. Marshal, and then I forget his name.

6    Q    And what was he asking you about?

7    A    He was asking me if I knew Mr. Doran and what's my

8    relationship with him and then what really happened, about

9    the running and what really happened here in the U.S. when he

10   got here and when they are with me.

11   Q    Did you also tell him about what Mr. Doran told you about

12   what happened in Vietnam?

13   A    They asked me that.  And then I answered the questions and

14   I told him what happened in Vietnam.

15   Q    Again, that he killed people?

16   A    Yeah, I told him.

17   Q    Did you tell him also that Mr. Doran had told you that he

18   had put the bodies in a hotel closet?

19   A    He didn't tell me that.  But that was in the article.

20   Q    Okay.  So that came from the news article you read?

21   A    Yes.

22   Q    All right.  So some of the information that you provided

23   to the U.S. Marshal came from what you had read on the

24   Internet?

25   A    Yeah, I read it.  I also tell that to them.

1  Q    How many times have you been interviewed by the U.S.

2  Marshal?

3  A    Just once.

4  Q    Just once.  And then when you came up here to Seattle for

5  this, were you interviewed again?

6  A    No.

7  Q    You didn't talk to Mr. Werner or Mr. Friedman about

8  anything?

9  A    Oh, yeah, they called me.  They send me a paper, a

10  subpoena.

11  Q    Well, I know that.  But when you came up here today, did

12  you meet with Mr. Werner or Mr. Friedman?

13  A    Yes, I met them.

14  Q    And did you talk about what happened down in -- what

15  Mr. Doran may have told you?

16  A    Yes, we talked.

17  Q    All right.  Have you discussed it with anybody else?

18  A    No, just us.

19  Q    Just you two.  All right.  Ms. Pineda, what is your

20  immigration status?

21  A    Oh, I'm illegal here.

22  Q    You are illegal?

23  A    Yeah.  My visa is up.  I admit that.

24         MR. MARCHI:  Nothing further, Your Honor.

25         THE COURT:  Ms. Pineda, it seemed to me that you were

1    saying at one point that when you got this call from

2    Mr. Doran, that he said something like the men who were after

3    him were after him in North Dakota, too?  Did I misunderstand

4    that?  Did you say that somehow he was in danger in the

5    United States?

6              THE WITNESS:  Yeah.  He told me at that time that he

7    was looking for a place for him, a safe place for him.  He

8    told me that they were looking for him, that some U.S.

9    Marshals were looking for him.

10             THE COURT:  Okay.  U.S. Marshals were looking for

11   him, not the bad guys.

12             THE WITNESS:  No, no, no.  The U.S. Marshals.

13             THE COURT:  Did he say why they were looking for him?

14             THE WITNESS:  He told me that -- on the phone call,

15   he told me he was going to tell me everything when he got

16   there, when he got to that place.

17             THE COURT:  I see.  Did he ever tell you that he had

18   not registered as a sex offender and that he was in trouble?

19             THE WITNESS:  He didn't tell me anything about that.

20             THE COURT:  He never mentioned anything about that?

21             THE WITNESS:  No.

22             THE COURT:  And then, when he was with you, was he

23   around other children besides his own children?

24             THE WITNESS:  No, just his children.

25             THE COURT:  I mean, did you have cousins or other

1    people who he would interact with at all, just play dates or

2    things like that, or was he not around other children?

3            THE WITNESS:  No.

4            THE COURT:  Okay.  Thank you very much.  You can step

5    down.  I really appreciate you coming in.

6       Thanks, Ms. Lee.

7            MS. LEE:  You're welcome.

8            THE COURT:  Do you want to do anything else, other

9    than just schedule something for -- okay.  I have two dates.

10   Now, as you know, I'm busy, busy.  And then we also have

11   sequestration issues and things like that.  I have

12   April 29th, at 9:30, if you think a month is enough time.

13           MR. FRIEDMAN:  I was going to suggest, Your Honor,

14   that the hardest thing to do would be to coordinate a phone

15   call to Vietnam, both to get approval and to plan a time of

16   day that works for both.  So maybe we should reach out to the

17   court next week.  I don't even know what time of day here is

18   also daytime there.

19           THE COURT:  Well, I've done this before with

20   Mr. Clark.  Do you remember Mr. Clark at all?

21           MR. FRIEDMAN:  Vaguely.

22           THE COURT:  It was the first guy I prosecuted under

23   the traveling to a foreign country and having sex with

24   somebody there.  And he was in Cambodia, where he met the

25   children.  So he was here, in the old courthouse, with a

1    public defender and a prosecutor here.  And the U.S. Attorney

2    and the other public defender were in Cambodia with the

3    witness.  So the timing is that we started that around 5

4    o'clock.

5             MR. FRIEDMAN:  Our time.

6             THE COURT:  Our time, 5:00 p.m., and then went until

7    like 8:00 or so.  So that's not going to be so hard to

8    schedule in terms of my availability.  It's going to be hard

9    to schedule in terms of getting a marshal and the Bureau of

10   Prisons and transportation and things like that.

11            MR. FRIEDMAN:  Right.

12            THE COURT:  But that part is relatively -- once we

13   have the date, we'll do it.

14            MR. FRIEDMAN:  Okay.

15            THE COURT:  But what's going to be harder is, after

16   we do that, to get another date to come back into court.  So

17   why don't we pick May 23rd, at 9:00 a.m., just so we keep

18   something on the agenda.

19       And then in the meantime, we'll see if you can move it up.

20   I'll try to save April 29th, at 9:30 a.m., as an open slot.

21   But, realistically, I think we are probably going to need at

22   least a month to set this up and then a month before we can

23   go forward.

24       You had other witness, though, right, that you sent away

25   today that you wanted to call?

1          MR. FRIEDMAN:  One would be five to ten minutes in

2    documents, and the other would be comparable to Ms. Pineda.

3          THE COURT:  Okay.  So I think that once we finish

4    with the Vietnamese investigator, we are really talking about

5    a half-day proceeding, at the most.

6      And you have some witnesses also?

7          MR. MARCHI:  Your Honor, I do have some witnesses.

8    And one thing that I alerted the government to over the break

9    is I start a month-long trial with Judge Shea starting

10   April 15th.  So we'll work with our schedules to get these

11   things done.  The May date would work.  But, yes, we do have

12   witnesses.  And I don't anticipate that they will take that

13   long.

14         THE COURT:  Okay.  So we'll keep that May 23rd, at

15   9:00 a.m., date as our target.  And we will hope for good

16   luck in between now and then.  And I think that I already

17   covered it from a legal perspective.  I'm not asking for

18   further briefing or anything like that.  But if you see

19   issues or cases that I haven't addressed, let me know about

20   that, too.

21     Otherwise, we will finish the testimony, and we will go

22   forward with the actual sentencing on May 29th, okay?

23         THE CLERK:  May 23rd.

24         THE COURT:  May 23rd, at 9:00.  Sorry about that.

25   May 23rd.

1      MR. MARCHI:  And, Your Honor, the government has

2  indicated to me that they are going to give me additional

3  copies that were copied today from the Vietnamese officer.

4      THE COURT:  It looks like they are right there.

5      MR. MARCHI:  All right.  Also, Your Honor, because

6  the government has contact with this witness, I'm assuming

7  the government will assist me if I have further questions

8  that maybe we can get to the witness in Vietnam.

9      THE COURT:  Sure, that's a great idea, sending some

10  written questions to the government.

11      MR. MARCHI:  And that is one thing I would propose,

12  Your Honor, is maybe after I digest all this and get it

13  translated, I'll have some more questions.  And we can maybe

14  do some of it that way so I can get some of my questions

15  answered.

16      THE COURT:  Sounds very reasonable.  Good.  All right

17  then.  We'll see you hopefully before May 23rd, and then May

18  23rd to finish it off.  Thank you.

19      MR. FRIEDMAN:  Thank you, Your Honor.

20      (Proceedings adjourned.)

21

22

23

24

25

1              C E R T I F I C A T E

2

3

4          I, Kari McGrath, CCR, CRR, RMR, Official Court

5   Reporter for the United States District Court in the Western

6   District of Washington at Seattle, do hereby certify that I

7   was present in court during the foregoing matter and reported

8   said proceedings stenographically.

9          I further certify that thereafter, I have caused

10  said stenographic notes to be transcribed under my direction

11  and that the foregoing pages are a true and accurate

12  transcription to the best of my ability.

13

14     Dated this April 17, 2013.

15

16                    /S/  KARI McGRATH

17                    Kari McGrath, CCR, CRR, RMR

18                    Official Court Reporter

19

20

21

22

23

24

25