UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

───────────────────────────────────────────

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          ) CASE NO. CR12-0001RSL
                                    )
v.                                  ) SEATTLE, WASHINGTON
                                    ) April 1, 2014
TIMOTHY GEORGE DORAN,               )
                                    ) EVIDENTIARY HEARING
                Defendant.          ) (continued)
                                    )
───────────────────────────────────────────

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

───────────────────────────────────────────

APPEARANCES:

 For the Plaintiff:     BRIAN D. WERNER
                        ANDREW C. FRIEDMAN
                        ASSISTANT UNITED STATES ATTORNEYS


 For the Defendant:     JAY WARREN STANSELL
                        DENNIS CARROLL
                        FEDERAL PUBLIC DEFENDER'S OFFICE


 Reported by:           NANCY L. BAUER, CCR, RPR
                        Federal Court Reporter
                        700 Stewart Street, Suite 17205
                        Seattle, WA 98101
                        (206) 370-8506
                        nancy_bauer@wawd.uscourts.gov

April 1, 2014                                    6:00 p.m.
                        PROCEEDINGS
_____

          THE CLERK:  Case CR12-001L, United States v. Timothy
Doran.

     Counsel, please make your appearances for the record.

          MR. WERNER:  Good evening, Your Honor.  Brian Werner
and Andrew Friedman with the United States Attorney's Office,
representing the government.  Also at counsel table is U.S.
Deputy Marshal Lisa Stevenson.

          THE COURT:  Great.  Thank you.

          MR. STANSELL:  Good evening, Your Honor.  Jay
Stansell and Dennis Carroll representing Tim Doran, who is
present.

          THE COURT:  Great.  Thanks.  And we have Brian
Facklam here from U.S. Probation.

     We are continuing, a year later, the sentencing hearing.
We heard the direct examination live back then, and now we're
going to do the cross-examination over the telephone.  Paul
Tu, our interpreter, who handled things before, is going to
come forward.  What's the best place for you to be?  Up here
on the witness stand?

          THE INTERPRETER:  Probably, yes.

          THE COURT:  Sure.  Kerry, are you ready to make the
call?

          THE CLERK:  Yes.

```
 1          THE COURT:  Everybody ready?
 2          MR. STANSELL:  Yes, Your Honor.
 3          THE COURT:  Good.  Let's do it.
 4          UNIDENTIFIED SPEAKER:  (Speaking Vietnamese.)
 5          THE INTERPRETER:  (Speaking Vietnamese.)
 6          UNIDENTIFIED SPEAKER:  (Speaking Vietnamese.)
 7          THE COURT:  This is Judge Robert Lasnik, U.S.
 8   District Court judge.  Do you have know Tuan Ngoc Huang
 9   there?
10          UNIDENTIFED SPEAKER:  Which one you want to talk?
11          THE INTERPRETER:  Huan Ngoc Huang.
12          UNIDENTIFED SPEAKER:  Please call back in three or
13   five minutes, please.
14          THE INTERPRETER:  Five minutes?
15          UNIDENTIFED SPEAKER:  Yes.  Thank you very much.
16   Thank you very much.
17          THE COURT:  While we're waiting, Mr. Werner and
18   Mr. Friedman, you have two more witnesses for the sentencing
19   hearing.  Who are they, and when do you plan on presenting
20   their testimony?
21          MR. WERNER:  Your Honor, the witnesses we still
22   intend to call are Mr. David Williams and Mr. Marvin
23   Chargualaf, or another representative from CBP.  Those are
24   the two other witnesses we had planned to call at last year's
25   hearing.
```

 1          THE COURT:  Okay.  Great.  So that's unchanged?

 2          MR. WERNER:  Yes, Your Honor.

 3          THE COURT:  Okay.  And how much time do you need for

 4   those?

 5          MR. WERNER:  Approximately an hour, maximum.

 6          THE COURT:  And Mr. Stansell and Mr. Carroll, this is

 7   the first time I've seen you representing Mr. Doran.  Is

 8   there anything that you wanted to bring up with the court at

 9   all going forward?

10          MR. CARROLL:  Well, I think it might be helpful if

11   we, since we have some time, to talk about scheduling issues,

12   about when we anticipate to have the government's case done.

13   The defense anticipates -- of course, if Mr. Doran elects to

14   testify, then he would testify.  We do anticipate having some

15   evidence to submit.  It may be by way of declaration or

16   reports, or it could be live witnesses.

17       Just to let the court know, Mr. Stansell is going to

18   Vietnam in a couple of weeks, and so that may affect what we

19   present.

20       But I think it would be helpful if we had an understanding

21   of sort of the timing of issues.  I think it would be our

22   preference, if we did the evidentiary portion of the

23   sentencing hearing, heard from the court, had some kind of

24   either closing arguments or written arguments, and the court

25   make a finding regarding this particular issue, and then have

the ultimate what-sentence-gets-imposed kind of a hearing.

THE COURT:  At a different time?

MR. CARROLL:  Yes.

THE COURT:  Okay.  So when will you be ready with your two witnesses?

MR. WERNER:  Your Honor, I would say in two to three weeks, at the court's pleasure.  We need to get a date and have them resubpoenaed.

THE COURT:  Do you want to wait until Mr. Stansell comes back from that trip, or do you want to do that before he leaves?

MR. STANSELL:  I don't think it matters, Your Honor. One of our problems is, we need to get approval from, for lack of a better word, the mucky-mucks in Washington, D.C. It's whoever signs off on international travel.  It's a confounding process, where you wait and wait and wait, and then you get it.  So I'm planning on leaving on the 18th of April, but we're not sure whether that's going to stand or not.

THE COURT:  So would you rather have it in a couple of weeks or a month or six weeks?  What would you like?

MR. CARROLL:  I think we'd probably prefer to have it after Mr. Stansell gets back from Vietnam, just so we know what we have to get our arms around, and then we could probably combine our hearing, since the government's

 1    remaining part of their case would be relatively short.

 2         THE COURT:  Okay.  Why don't the four of you look at

 3    some dates with Kerry, and see what works, and then whatever

 4    you agree on, it's okay with our schedule.  Kerry, let's set

 5    aside two hours, just to play it safe.  And it doesn't

 6    necessarily have to be on a Friday, but it has to be on a day

 7    when we have the ability to bring Mr. Doran over.  We're

 8    still on that schedule, aren't we?

 9         THE CLERK:  Yes.

10         THE COURT:  Yes.  So it may have to be a Friday.

11    What's our other day?

12         THE CLERK:  Tuesday and Thursday.

13         THE COURT:  Okay.  So we'll work something out with

14    Kerry.  It may be May, middle of May, or something like that.

15    Okay?

16       Do you feel like trying again?

17         THE WITNESS:  Hello?

18         THE INTERPRETER:  (Speaking Vietnamese.)

19         THE WITNESS:  It's me.

20         THE COURT:  This is Judge Lasnik again.  Thank you

21    very much for making yourself available.  You're still under

22    oath from when I swore you in last year.  Are you ready to

23    answer questions from Mr. Doran's defense attorneys?

24         THE WITNESS:  Please speak up louder because I cannot

25    hear from here.

1          THE INTERPRETER:  (Repeats translation.)

2          THE WITNESS:  Yes, I'm ready.

3          THE COURT:  Okay.  We're going to keep our

4    interpreter's voice up, and we're going to start with

5    questioning from Mr. Jay Stansell, who is Mr. Doran's

6    attorney.

7                        CROSS-EXAMINATION

8    BY MR. STANSELL:

9    Q   Hello, Mr. Huang.

10   A   Hi.

11   Q   I was not at the last hearing, but I'm now one of

12   Mr. Tim's attorneys.  I've read your direct examination.  I'm

13   going to refer to our client as "Mr. Tim," because I think

14   that's how you referred to him when you last spoke.

15          Mr. Huang, I first want to clarify your position with

16   the police department there.  I read that you are the deputy

17   officer of the Khanh Hoa Police Department there.

18   A   I'm the deputy head officer of the investigative branch of

19   the Khanh Hoa Police Department.

20   Q   Very well.  Were you the supervisor of the investigation

21   into the death of Ms. Ngoc?

22   A   I'm not the supervisor, but I'm the deputy head officer,

23   and I do supervise some investigators, and I'm also an

24   investigator myself.

25   Q   Okay.  And were you one of the police officer

1  investigators who responded and went to the house where

2  Ms. Ngoc's body was found?

3  A    Yes, I was present at the place.  But I just want to

4  clarify that the apartment did not belong to Miss Ngoc.  That

5  was the apartment that -- Mr. Tim lived there, and then

6  Ms. Ngoc move in with him.

7  Q    Very well.  And so you, as I understand it, were notified

8  by the landlord, who called you to come to the house that

9  that couple owned?

10  A    That's correct.

11  Q    And so, Mr. Huang, could you please turn to Tab No. 15 in

12  the binder of exhibits that I hope you have in front of you?

13  This is the report that, in English for us, is translated as

14  the report of the crime scene examination.

15  A    Yes, I see it.

16  Q    Okay.  And so there's a listing of the individuals who

17  were part of that investigation, and I'm wondering why your

18  name is not on that list.

19  A    According to Vietnamese law, I was the deputy head officer

20  of the investigative branch, and I direct investigators with

21  their investigation.  And on the list is Mr. Le Van Thanh.

22  He was one of the investigators, and that's spelled L-e,

23  V-a-n, T-h-a-n-h, and he was the one who performed the

24  examination.

25  Q    Okay.

1  A    But I was present there.

2  Q    Were you present the entire time that the house -- the

3  examination of the house went on?

4  A    I don't understand your question.

5  Q    Well, I anticipate that the investigators were at the

6  house for some time gathering evidence.  Were you there the

7  entire time they were at the house gathering evidence?

8  A    Yes.  I was present from the time that the body was

9  discovered and we arrived there, and during the whole time

10  that the examination took place of the crime scene, and also

11  from the time when they -- the body was moved to the hospital

12  for an autopsy.

13  Q    Thank you.  I also want to clarify, on the second line of

14  the list of people that were there at the crime scene, I have

15  the names Nguyen Trong Tam and Nguyen Van Tho.  What role did

16  they serve?

17  A    Mr. Nguyen Trong Tam and Mr. Nguyen Van Tho, they are the

18  examiners that belong to the technical forensic office, and

19  they were there to collect forensic evidence, like,

20  fingerprints, and then they would make a report of the

21  result.

22  Q    Okay.  Thank you.

23        And then the next line, Le Dinh Hong was a prosecutor.

24  Was that person just observing, or participating in the

25  investigation?

1    A    He was there to observe it, also to supervise to make sure

2    that the investigation followed the law.

3    Q    Okay.  The person there, Vo Han Ha, was from the public

4    security office.  Did that person have any role in the

5    investigation on the scene?

6         THE INTERPRETER:  Your Honor, the interpreter cannot

7    hear clearly.

8         THE COURT:  Ask him to repeat.

9    A    Mr. Vo Van Ha, he was the officer of the public security

10   office of Loc Tho, and they are the ones that are in charge

11   of the house where the -- at the address of 11th Street,

12   Nguyen Thien Thuat.

13   Q    And what role did he have in the investigation?

14   A    He was just there to observe.  He did not participate in

15   the investigation.  He was just there to confirm that the

16   location of the house is within the authority of his office.

17   Q    Okay.  And the person listed as a team leader of the 11th

18   Street team, is that person also an observer from the

19   community?

20   A    She was just there to observe.  She is part of the regular

21   population, and she was just there to observe.

22   Q    And the house owner was there just to observe, right?

23   A    Yes.

24   Q    Were all of these people wearing protective gloves to

25   avoid contaminating surfaces in the house?

A    No.  Only the investigators wore gloves, like Mr. Le Van

Thanh, Nguyen Trong Tam, and Nguyen Van Tho.  All the other

ones, they were outside just looking.  They did not touch

anything in there.

Q    And, Mr. Huang, your office conducted a number of

different interviews of witnesses then?

A    Correct.

Q    And I count about ten of those in my binder.

A    I don't remember exactly the number, but that's about

right.

Q    That's fine.  I just wanted -- so these were conducted by

other people in your office, but not by you; is that right?

A    Correct.

Q    Okay.  But these other investigators were under your

supervision; is that right?

A    Correct.

Q    Okay.  Well, I'd like to ask you questions about a

handful -- maybe four or five of those witnesses.  The first

one is behind Tab No. 21.  Did you find that tab?  I'm not

going to pronounce this very well, but it's Hoang Vu Kieu

Huong?

A    Yes.

Q    And so did you see that -- do you see those materials?

A    Yes, I have it.

Q    And so in the course of her statement to your

1    investigator, she indicated she had been a part-time nanny

2    for Mr. Tim?

3    A    Yes.

4    Q    And so because of that, she had a key to the house?

5    A    Yes.

6    Q    Okay.  So on or around March 8th or March 9th, she was

7    asked by Mr. Toan to go pick up and retrieve a motorcycle

8    that Mr. Tim had rented?

9    A    Yes.  She did go in to retrieve the motor vehicle, but she

10   did not remember whether it was March 7 or March 8, and that

11   was, like, after Mr. Tim had left.

12   Q    Okay.  Thank you.  And then when she went to retrieve the

13   motor vehicle, though, she went into the house to look into

14   Mr. Tim's bedroom to see if he had packed his belongings and

15   moved out, correct?

16   A    She didn't know what was going on, so she went to the room

17   and she saw that there was some clothing on the bed.

18   Q    Okay.  And so in her statement to the investigators, she

19   did not report anything unusual about the house at that time?

20   A    Yes, at the time, she had not discovered anything.

21   Q    Okay.  Thank you.

22        Mr. Huang, I'd like to ask you to look at Tab No. 24,

23   and just let me know when you've got that ready.

24   A    Yes, I have it.

25   Q    Okay.  And so this is the interview conducted by one of

1    your other investigators of Nguyen Dinh Toan; is that right?

2    A    Correct.  Yes, he is one of the officers in my office.

3    He's not the investigator yet, but he was one of the persons

4    working in my office.

5    Q    How much experience did he have with the police force?

6    A    I don't remember exactly, but probably about ten years.

7    Q    Okay.  So he interviewed Mr. Toan, correct?

8    A    Correct.

9    Q    And so Mr. Toan stated that he had been a friend of

10   Mr. Tim's since April of 2010; is that right?

11   A    Correct.

12   Q    And in the afternoon of March 6th, 2011, he had slept in

13   the afternoon, but when he woke up, he saw he missed a lot of

14   phone calls from Mr. Tim; is that right?

15   A    Correct.

16   Q    And so he was concerned, so he called Mr. Tim back and

17   Mr. Tim told him that, "Somebody wants to kill me"?

18   A    Correct.

19   Q    And so Mr. Toan was so concerned he went over to

20   Mr. Doran's house that same day to make sure he was okay?

21   A    Mr. Toan told Mr. Tim to call the police, and Mr. Tim hung

22   up the phone.  And then about 1800 hours, Mr. Toan went to

23   the house, but he did not go inside the house.

24   Q    And so your investigative reports are clear that he was

25   outside the house; is that right?

1    A    Yes.

2    Q    But Mr. Toan told the investigator that he talked to

3    Mr. Doran at the house, right?

4    A    Correct.

5    Q    And Mr. Tim's two young sons were playing outside the

6    house?

7    A    Correct.

8    Q    And things seemed normal to Mr. Toan?

9    A    Correct.

10   Q    Now, the next day, on March 8th, I understand Mr. Toan

11   said that Mr. Tim called him and said he was in Saigon and

12   that someone wanted to kill him?

13   A    Yes.

14   Q    Okay.  Now, is it at this point that Mr. Tim asked Toan to

15   request that Hoang (sic) go pick up the motorcycle that he

16   had rented, because she had keys to the house?

17   A    Yes, Ms. Huong.

18   Q    Sorry.  I pronounced that wrong.

19        And then days later, on March 12th, Mr. Toan saw on his

20   email a message from Mr. Tim saying, "Organized crime wanted

21   to kill me.  I did not want to die"?

22   A    Yes.

23   Q    Thank you, Mr. Huang.

24        I'd like you to look at Tab No. 25, please, the

25   interview of Nguyen Thi Kim Sa.

```
1    A    Yes, I see.  I found it.

2    Q    And you spoke about Ms. Sa in your direct examination last

3    year; is that correct?

4    A    Yes.

5    Q    And according to your investigator, she told your

6    investigator that Mr. Doran and Ms. Ngoc had, as she called

7    it, "a very tense relationship"?

8    A    Yes, that's what Ms. Ngoc told her, that at the later part

9    of the relationship, it was tense.

10   Q    Okay.  And isn't it true that Ms. Ngoc told Ms. Sa that

11   she would hire gangsters to beat up Mr. Doran, Mr. Tim?

12   A    No, nothing like that.

13   Q    Mr. Huang, do you recall testifying last year about

14   Ms. Sa's statements regarding Ms. Ngoc?

15   A    Yes.

16   Q    Okay.  And in your testimony last year on March 22nd, you

17   stated that Ms. Sa said that Mr. Tim many times hit Ngoc?

18   A    According to Ms. Sa, Ms. Ngoc told her that in the latter

19   part of the relationship, before the event, the incident,

20   there was some conflict between Tim and Ms. Ngoc, and Tim

21   threatened to hit Ngoc, and he wanted to marry her, and he

22   threatened her, and that's when she said that she would hire

23   gangsters to beat him up.

24   Q    And, Mr. Huang, I just want to be clear.  So you have in

25   front of you the Vietnamese version of the investigative
```

1    reports with Ms. Sa.  Is that the correct report that you

2    have in front of you?

3    A    Yes, I do.

4    Q    And so you don't have any other investigative reports

5    related to Ms. Sa; is that correct?

6    A    No.

7    Q    Thank you.

8         I'd like to move on to Nguyen Thi My Le at Tab 26.

9    A    Yes.

10   Q    Are you there?  Okay.  And so Ms. Le met Mr. Tim in the

11   beginning of January of 2011; is that correct?

12   A    Yes.

13   Q    Okay.  And as I understand it, she told your investigator

14   that for a time she moved into the house to take care of the

15   kids, and she lived there?

16   A    Yes.

17   Q    But that she moved out on or about February 10th, 2011,

18   correct?

19   A    Yes.

20   Q    Then she heard from the landlord -- or the landlord called

21   her, complaining -- wanting to know where Mr. Tim was; is

22   that right?

23   A    During what period of time?

24   Q    Around March 10th, 2011.

25   A    No, February.  March 10, the landlord called.

1   Q   Okay.  And then --

2   A   In February -- February 10th was when the landlord called

3   Ms. Le and asked, "You're the one on the lease.  How come you

4   let another woman live in there with Mr. Tim?"

5   Q   Okay.  Isn't it true that Ms. Le talked to your

6   investigators about going online on the Internet on March

7   11th, 2011, and communicating with Mr. Tim?

8   A   Yes.

9   Q   Okay.  Then Ms. Le provided copies of those emails and

10  chats to your office, and you turned them over to the

11  government here?

12  A   Just the email and the message, but not the live chat.

13  You cannot get that.

14  Q   Of course.  That's right.  I'm sorry.

15      And I'd like to refer you to a particular page of those

16  messages and emails.  You've already identified them when you

17  testified on direct examination here last year.  So I'd like

18  to direct you to -- and I realize you don't speak English,

19  but I just want to direct you to a place there.

20  A   Yes.

21  Q   I'd like you to page through Tab No. 12 to pages 14 and

22  15.

23  A   Tab 12, page 14 and 15 of the email?

24  Q   That's right.  We're talking Tab No. 12, and go to page 14

25  and 15.  And I can identify the ones that I'd like you to

1    look at by looking at the numbers at the top.  The one page

2    that I'm looking at has, at the very top, 10:51:55 a.m.

3    A    Can you specify again where that document is located, or

4    that page is located?

5    Q    Yes.  It's Tab 12, but counsel has another -- the

6    prosecutor here has motioned to me that maybe he can help us

7    find it.  Mr. Werner?

8         MR. WERNER:  I think I can.  Sir, if you go to Tab

9    30, to the page that is stamped TD0000685, I think that's the

10   same page Mr. Stansell is referring to.

11        MR. STANSELL:  If we could just have a moment, Your

12   Honor.  We need to get organized here.

13        THE WITNESS:  This is another lady.  This is Thunga

14   Trinh, not Ms. Le.

15        MR. WERNER:  All right.  I think Mr. Friedman's got

16   Tab 31, page TD657.

17        MR. STANSELL:  Yes.

18        THE INTERPRETER:  Can you repeat the number?

19        MR. WERNER:  Tab 31, TD657.

20   Q    (By Mr. Stansell) So I'm at TD657.

21   A    Yes, I've got it.

22   Q    Okay.  And if we look a third of the way down, where the

23   numerals 11:58:14 are -- or two-thirds of the way down.

24   A    Yes.

25   Q    In English that says -- and have you had these translated

1    into Vietnamese, these emails and online messages?

2    A    No, but I can understand very well.

3    Q    Okay.  Because on that line, Mr. Tim is telling Ms. Le,

4    "Tell them to talk to Dang because Dang told me not to call

5    the Mafia, and she saw one Mafia pick up Ngoc that night."

6         Did your office ever investigate or try to interview a

7    woman name Dang about whether Ms. Ngoc had connections to the

8    Mafia or other bad people?

9    A    No, we don't know about Dang, or Miss Dang.  We don't know

10   her.

11   Q    Have you tried to find out who Ms. Dang is?

12   A    No, we could not find her.

13   Q    And I'm just trying to clarify the answer to that,

14   Mr. Huang.  Did you try to find Ms. Dang?

15   A    No.

16   Q    Okay.  Next I'd like you to just go to Tab 28.  There is

17   the investigation of the interview with Trinh Thi Thu Nga?

18   A    Yes.

19   Q    And so Ms. Nga provided also emails and messaging or chats

20   to your office; is that correct?

21   A    Yeah.

22   Q    And those are at both Tab 12 and Tab 30, but let's look at

23   Tab 30, please.  Are you with me there on Tab 30?

24   A    Yes.

25   Q    Okay.  So if you look at the second page behind Tab 30,

1    which at the bottom has the number TD00677?

2    A    Yes.

3    Q    And so it was in this chat or messages or emails, I guess,

4    that Mr. Tim tells Ms. Nga that there were two women who knew

5    that Mr. Ngoc was going to hire someone to kill him and take

6    his children.  Do you recognize that part of this?  I know

7    you don't speak English, and that's certainly not a bad

8    thing.  I don't speak Vietnamese.

9    A    I know some, but not much.  The part where it was written

10   in capitals?

11   Q    Yes.  If you go down, the last eight lines written in

12   capitals, at the bottom.

13   A    Yeah.

14   Q    Okay.  And so he's telling Ms. Nga that Ngoc was trying to

15   take his sons and sell them.  So do you see that, where he

16   says that?

17   A    Yes, I see it.

18   Q    Okay.  And then on the third line from the bottom, he

19   talks specifically about two women named Khoa and Dang, and

20   there's a phone number, saying that these two women know how

21   Ms. Ngoc worked with -- had connections with the Mafia, or

22   criminals.

23   A    Yes.

24   Q    Did your office try to find -- you said that your office

25   did not try to find Ms. Dang.  Did you ever try to find

1    Ms. Khoa?

2    A    No.

3    Q    Okay.  Mr. Huong, I'd like you to go to page 22, the

4    investigative reports related to Le Thi Hong Trang.

5    A    Yes, I have it.

6    Q    Okay.  And so your investigators interviewed Ms. Trang on

7    two occasions, I think?

8    A    Yes.

9    Q    And so the first one, March 13th, 2011, correct?

10    A    Yes.

11    Q    And then the second time on June 15th, 2011?

12    A    Yes.

13    Q    And in those interviews, she said she did not know where

14    Mr. Tim was living at the time Ms. Ngoc was killed?

15    A    Correct.

16    Q    Okay.  And I want to jump, if I could, briefly, to Tab

17    No. 15, which is the report of the crime scene examination.

18    And either at the bottom of the third page, or the very last

19    page of the crime scene investigation, it indicates that

20    there was a bank card with Ms. Trang's name on it found at

21    the scene where Ms. Ngoc was found dead.

22    A    Yes.

23    Q    Okay.  And a number of withdrawal receipts related to that

24    bank card from the Vietnam Agricultural Bank.

25    A    Yes.

Q    But your investigators never asked her how her bank card and her receipts for money got at the scene where Ms. Ngoc was found dead, did they?

A    Ms. Trang did tell us that she used to have a relationship with Mr. Tim, and they did have some kind of financial exchange, and that was, like, the previous period of time, before Ms. Ngoc knew Mr. Tim.

Q    But you never asked her why her property would be at the scene of a murder, did you?

A    Ms. Trang did explain to us that she used to live with Mr. Tim.  She used to have a relationship, so it did not surprise us.  We did not go any further regarding the bank card, because they did have a relationship during the previous period of time.

Q    But she never lived at this house, correct?

A    Correct.

Q    And she told you that she had never -- she didn't even know where that house was, correct?

          THE INTERPRETER:  Can you repeat that question?

Q    (By Mr. Stansell)  She told your investigators that she did not know where Mr. Tim and Ms. Ngoc lived, correct?

A    She knew where they lived before, but not when -- during the time that Ngoc was killed.  And regarding, you know, the bank card and the receipt, actually, we were planning to ask Mr. Tim about it, but we did not get a chance to do that.

1    Q    And you didn't think to ask Ms. Trang for a set of her

2    fingerprints to compare them with the fingerprints that were

3    found at the scene, right?

4    A    Yes, we were going to do that, but then she moved to

5    Australia.

6    Q    Okay.  And she moved to Australia shortly after Ms. Ngoc's

7    death, correct?

8    A    We don't know when she moved, but that was after June

9    2011, because June 2011 was when we interviewed her.

10   Q    Do you know where Ms. Trang is now?

11   A    We don't know where she is for sure, because last year

12   when we tried to get her fingerprints, we went to her house

13   and her family said that she had moved to Australia, and up

14   to now we don't know where she is.

15   Q    Okay.  One last question about Ms. Trang, Mr. Huang.

16   Towards the end of that interview, the March 13th interview,

17   she told your investigator that she had heard that Mr. Tim

18   had bought Ms. Ngoc a gold bracelet; is that correct?

19   A    Yes.

20   Q    And that Mr. Tim had wanted it back, but Ms. Ngoc refused

21   to give it back, right?

22   A    Correct.

23   Q    And that she had also heard that Ms. Ngoc had called

24   someone to beat Mr. Tim up?

25   A    Ms. Trang did say that, but...

Q    I'm going to move past the witnesses now to some questions
about the crime scene investigation again.

A    Yes.

Q    And to Tab 15.  Now, I think you clarified then that the
two individuals from the criminal technical office would have
been the ones collecting fingerprints; is that right?

A    Yes.

Q    And how long did they spend gathering fingerprints from
the house?

A    Well, from when we discovered, we started working in the
evening of the 13th, and then we moved the body to the
hospital.  We were there for, like, three hours.  And then
the next day, on the 14th, we went back to the house at 8:00
a.m., and we worked into the afternoon.  So, total, that
would be about ten hours.

Q    Okay.  And, Mr. Huang, I'm going to try to save time and
not walk through each of the fingerprints that were found.
But I'd just like to ask you, so, behind Tab 15, is that an
accurate summary of every fingerprint that was found during
your investigation?

A    Correct.

Q    Okay.  I counted about 15 fingerprints.  That number is
not so important, but I just wanted to clarify that it looks
like there were only three or four fingerprints that there
was an assessment conclusion about?

A    Yes.

Q    Okay.  And those assessment conclusions are at page --

Tab 19, and that indicated that the door panel of the storage

area in which Ms. Ngoc's body was found was not a fingerprint

from Mr. Doran.

A    Correct.  Mr. Tim's fingerprint was found on the handrail

of the staircase.

Q    Okay.  And it's my understanding, Mr. Huang, that that was

a staircase from the ground floor to the first upper floor, I

guess.  In America we call it the second floor.  In Vietnam

you may call it the first floor.

A    Correct.  Actually, that was a staircase from the second

floor going to the third floor.

Q    Okay.  Why weren't any of these other fingerprints

assessed or compared to Mr. Doran's prints?

          THE INTERPRETER:  Can you repeat the question?

Q    (By Mr. Stansell)  Okay.  In Tab 15, the crime scene

report, there were maybe a dozen or more fingerprints

gathered.  Why weren't more of them assessed or compared to

Mr. Doran's prints?

A    Except for four fingerprints, the other ones did not

qualify, they did not have enough condition.  They were too

pale or not enough condition in order to do any comparison.

We only found four that had enough qualification for that.

Q    Okay.  Thank you.

```
 1            Mr. Huang, were there any efforts to match up those
 2    fingerprints to any other individuals besides Mr. Doran?
 3    A    We did compare with some people who were either present or
 4    had something to do with the house, like the landlord or
 5    Ms. Huong or Ms. Le.  But from what I understand, after
 6    Mr. Tim had left, like, seven or eight days later, when the
 7    landlord discovered the body -- and there was also other
 8    people, so we have -- but we didn't know where those people
 9    were in order to do the comparison.
10    Q    Okay.  Thank you.
11            I have a few quick questions about the DNA, the
12    evidence collected for DNA analysis.
13            Looking at Tab 17 and 18, your office collected
14    evidence from the scene for later DNA analysis, correct?
15    A    Yes.
16    Q    And, specifically, you testified last year that you
17    collected blood samples from some pillows that were in the
18    upstairs bedroom, correct?
19    A    Correct.
20    Q    And so this was the same bedroom in which there was a
21    wardrobe with a broken mirror and pieces of the mirror on the
22    floor, correct?
23    A    Correct.  We did -- I'd like to clarify.  We did find two
24    samples of blood, one on each pillow, because there was two
25    pillows.
```

1   Q    Okay.  Thank you.

2   A    In the bedroom.

3   Q    Yes.  And -- okay.  So -- and you submitted those samples

4   for DNA analysis, and the reports of that analysis is at

5   pages -- at Tabs 17 and 18; is that correct?

6   A    Correct.

7   Q    Okay.  I have a few quick questions about the loft or the

8   closet where the body was found.

9   A    Yes.

10  Q    So it's my understanding that this closet, you get to it

11  from the landing of the last flight of stairs in the house.

12  A    Yes.  The stairs is the same that went from the second

13  floor to the third floor, and the landing is, like, in the

14  middle of the staircase, and that's where the door to the

15  closet is.

16  Q    Okay.  And it's my understanding from your crime scene

17  investigation on Tab 15 that the closet was measured 1.3

18  meters from the stair landing on those stairs?

19  A    Correct.

20  Q    And the opening was one meter wide?

21  A    Yes.

22  Q    And it was a half meter high?

23  A    Yeah.

24  Q    And how deep was the storage space?  How far back did it

25  go?

1    A    It's the same width as the bathroom.  It's the same width

2    as the bathroom, because it's on top of the bathroom, and

3    it's -- that would be 2.3 meters.

4    Q    So it goes back 2.3 meters?

5    A    Correct.

6    Q    Okay.  How many people were necessary in order to remove

7    the body from that closet?

8    A    Because the body had decomposed, we had to use two or

9    three people to remove it.  Usually, if it's just a regular

10   body, it would take just one person.

11   Q    Mr. Huang, I appreciate your patience.  We're getting to

12   the end here.

13        Last year you were asked the question, "Did you

14   investigate any connection to organized crime in this case?"

15   Do you remember that question?

16   A    Yes.  From what we understood, there was no Mafia or

17   organized crime involved.  The people that Ms. Ngoc was with

18   was, like, motor vehicle drivers.  There was no involvement

19   of the Mafia.

20   Q    Okay.  But there is crime in Nha Trang, right?

21   A    Yes.

22   Q    So just not maybe an organized Mafia in Nha Trang, right?

23        THE INTERPRETER:  Can you repeat the question?

24   Q    Let me strike that.

25        And there's crime against tourists in Nha Trang, I'm

1    assuming; is that right?

2    A    Yes, like, theft and robberies of the tourists.

3    Q    Is there a problem sometimes with prostitution in Nha

4    Trang?

5    A    Yes.

6    Q    Are you familiar with the term "taxi girls"?  Is that a

7    term that refers to women who sometimes prostitute

8    themselves?

9    A    I never heard of it.

10   Q    Well, in the cases of prostitution, have you come across

11   situations where prostitutes hire or have men to -- you know,

12   to deal with customers who don't pay them or abuse them?

13   A    No.

14   Q    Okay.  So you're not aware of men protecting prostitutes

15   or acting violently in reaction to an incident of

16   prostitution?

17   A    I understand where you're going, but I don't think that

18   this has anything to do with the prostitution.  Because

19   Mr. Tim and Ngoc lived there, and they have to register, and

20   the landlord knew about it, the neighbors knew they were

21   living there.

22       And please read the report on the examination of the body,

23   where there was a tear on her anus and her vagina that was

24   found, and also the blood was found on the pillows.

25       I think that everything, the email, the messaging, all

1    that happened after the incident already happened.  And I

2    think Mr. Tim was trying to set up some kind of a story,

3    because when that happened March 5th, on March 6th you could

4    see that Timothy had made numerous phone calls and emails,

5    and all that stuff.

6    Q   One last question.  So, Mr. Huang, you believe, then, that

7    the blood on the pillow was related to this offense; is that

8    correct?

9    A   Yes.

10          MR. STANSELL:  I don't have anything further.

11          THE COURT:  Mr. Werner?

12          MR. WERNER:  Very briefly, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MR. WERNER:

15   Q   Mr. Huang, can you turn to Exhibit 15 again, please?

16          THE WITNESS:  Who is this questioning me?

17          THE COURT:  This is the prosecuting attorney.

18          THE WITNESS:  Okay.

19   Q   (By Mr. Werner)  Mr. Huang, can you turn to Tab 15, a

20   document called, "Report of crime scene examination"?

21   A   Yes, I have that.

22   Q   Can you turn to the third page, where it discusses what

23   was found in the room corresponding to Room 1?

24   A   Yes.

25   Q   This is the room where the investigators found the

1    Eximbank card, correct?

2    A    Yes.

3    Q    And there's also receipts from the Vietnam Agriculture

4    Bank; is that right?

5    A    Yes.

6    Q    Are those different banks?

7    A    They're different banks.  One is the Vietnam Agricultural

8    Bank, the other is the Eximbank.

9    Q    Were there Vietnam Agricultural Bank receipts in the name

10   of Le Ti Hong Trang, or just the Eximbank card?

11   A    Only the bank card had Le Thi Hong Trang's name on it, and

12   the receipt did not have any name on it.

13   Q    Mr. Huang, turning your attention to the binder before

14   you, and I want you to look at Tabs 13, 14, 15, 16, 17, and

15   18, and my general question about those tabs -- or I should

16   also say 19.  13 through 19, are all those reports prepared

17   by Vietnamese law enforcement on this case?

18   A    Correct.

19   Q    And Tabs 20 through 29, are all those interview statements

20   either given to Vietnam police, or written down and handed to

21   the Vietnam police in connection with this investigation?

22   A    Correct.

23   Q    And the statements that were given to the police in this

24   case were given under oath, correct?

25   A    According to Vietnam law, people don't take an oath or

1    swear, but when they write the statement, they have to write

2    a guarantee that what they have written was the truth.  If

3    not, they would be under penalty of perjury.

4    Q    And Exhibits 30, 31, and 32, Mr. Huang, are those emails,

5    chats, and a rental contract given to the Vietnamese police

6    in connection with this investigation?

7    A    Correct, yes.  Not only that, they were asked to sign on

8    those documents when they submitted them.

9              MR. WERNER:  Your Honor, I offer Exhibits 13 through

10   32 for purposes of this hearing.

11             MR. STANSELL:  No objection, Your Honor.

12             THE COURT:  13 through 32 are admitted into evidence.

13                  (Exhibit 13 through 32 admitted.)

14             MR. WERNER:  No further questions.

15             MR. STANSELL:  Nothing further.  Thank you,

16   Mr. Huang.

17             THE COURT:  The investigator would like to ask you

18   about results, so we're going to tell him that you will talk

19   to him.  This is not the right situation for it.

20             MR. WERNER:  Great.

21             THE COURT:  But we are very, very grateful for you

22   making yourself available.

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  We're going to say good-bye now.

25   Thank you.

1      Thank you, Mr. Tu.

2           THE INTERPRETER:  Thank you, Your Honor.

3           THE COURT:  Okay.  Anything else you wanted to bring

4  up today?

5           MR. WERNER:  No, Your Honor.

6           THE COURT:  Thanks, counsel.  We are adjourned.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 11th day of April 2014.


/S/   Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter