```
 1                 UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4                                  )
      UNITED STATES OF AMERICA,      ) CR12-0001-RSL
 5                                   )
                      Plaintiff,     ) SEATTLE, WASHINGTON
 6                                   )
      v.                             ) May 22, 2014
 7                                   )
      TIMOTHY GEORGE DORAN,          ) Motion Hearing
 8                                   )
                      Defendant.     )
 9
10    _____

11              VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE ROBERT S. LASNIK
12              UNITED STATES DISTRICT JUDGE
      _____

13

14    APPEARANCES:

15

16

17    For the Plaintiff:      Anthony C. Friedman
                              Brian D. Werner
18                            Assistant United States Attorneys
                              700 Stewart Street
19                            Suite 5220
                              Seattle, WA  98101
20

21    For the Defendant:      Dennis Carroll
                              Jay W. Stansell
22                            Federal Public Defender's Office
                              1601 5th Avenue
23                            Suite 700
                              Westlake Center Office Tower
24                            Seattle, WA  98101

25
```

1          THE CLERK:  CR12-001-L.  United States versus Timothy

2     Doran.  Counsel, will you please make your appearances.

3          MR. WERNER:  Good morning, Your Honor.  Brian Werner

4     and Andrew Friedman on behalf of the United States.  With us

5     at counsel table is Lisa Stephenson with the United States

6     Marshal Service.

7          MR. CARROLL:  Good morning, Your Honor.  Dennis

8     Carroll and Jay Stansell on behalf of Mr. Doran.  Also at

9     counsel table is Rachel Greenley, a Rule 2 intern with our

10    office.  And, of course, also Mr. Doran is to our right.

11         THE COURT:  We also have Brian Facklam from U.S.

12    Probation who is here also.  So when last we were together

13    there was an indication that you would be presenting some

14    additional either witness declarations, et cetera.  And I

15    notice that you have a number of exhibits that you want to

16    talk about, admit, et cetera.

17       So, Mr. Carroll, how do you intend to do that?

18         MR. CARROLL:  We would just move to admit those

19    documents.

20         THE COURT:  All right.  And this is 501 through 506?

21         MR. CARROLL:  Correct, Your Honor.  And there is a

22    few exhibits with the government that I think we need to

23    clean up.  We'd like to move to admit a few of their exhibits

24    as well that have not been previously admitted.

25         THE COURT:  Mr. Werner, how do you feel about 501

1  through 506?

2         MR. WERNER:  We think for purposes of sentencing the

3  court should be able to consider those.  We have no objection

4  to them being admitted.  The other exhibits as well.  We will

5  discuss in our brief the weight to be given to those exhibits

6  versus testimony.

7         THE COURT:  Okay.  So 501 through 506, despite

8  obvious evidentiary problems with them for a trial, are

9  admitted for the purpose of the evidentiary hearing and

10  sentencing.

11         (Exhibit Nos. 501, 502, 503, 504, 505 and 506 were

12                admitted into evidence.)

13         THE COURT:  And do you know what government exhibits

14  you want to offer that have not been offered?

15         MR. CARROLL:  Yes, Your Honor.  There are two

16  declarations from consulate officials, those are Exhibits 7

17  and 8.  One is from Mr. Davenport, another is from a person

18  named Shao.  And also we would ask the court to consider

19  Exhibit No. 6, which is an article from an on-line English

20  language newspaper called *Very Vietnam*.  And we would ask

21  that be considered, not for the truth of what's in the

22  article, but that the article existed, it was available

23  on-line to the public.

24         THE COURT:  Okay.  I see what you mean.  All right.

25  So 7 and 8 are admitted into evidence, the declarations of

4

1     Chris Davenport and David Shao.  And No. 6 is admitted, not

2     for the truth of the article, but that it was accessible and

3     available on the Internet around that time.  All right.

4          And then, Mr. Carroll and Mr. Stansell, are you presenting

5     any additional witnesses today?

6          (Exhibit Nos. 6, 7 and 8 were admitted into evidence.)

7               MR. CARROLL:  No, Your Honor.

8               THE COURT:  All right.  And you've spoken to

9     Mr. Doran, obviously, about his right to testify at the

10    evidentiary hearing and he's elected not to?

11              MR. CARROLL:  That's correct, Your Honor.

12              THE COURT:  Okay.  And, Mr. Werner, then, you have

13    the original witness from the original list that you want to

14    call?

15              MR. WERNER:  We do, Your Honor.  Again, while we're

16    on the idea of exhibits, we do imagine we'll submit perhaps

17    one or two additional matters that we'll ask the court to

18    consider in connection -- in response to the exhibits that

19    we've just received from the defense.  We'll file those with

20    any future brief.  We don't have them with us today.

21              THE COURT:  Okay.  And, of course, let me know if

22    counsel objects to them or not, when you submit them.

23              MR. WERNER:  We'll advise ahead of time.

24              THE COURT:  So then the live witness you're going to

25    call today?

1          MR. WERNER:  Yes, Your Honor.

2          MR. FRIEDMAN:  Your Honor, we also have one

3    stipulation between the parties if I could advance.

4          THE COURT:  Certainly.

5          MR. FRIEDMAN:  It replaces two of the other

6    witnesses.  I won't read it into the record since we're

7    providing it to the court, but it concerns purchase of travel

8    tickets and travel to Vietnam.

9          THE COURT:  That's a stipulation that's going to be

10   admitted as a document?

11         MR. FRIEDMAN:  It is.  And it's been signed by all

12   the parties, Your Honor.

13         THE COURT:  I have a stipulation of the parties,

14   re: travel.  And it's signed by Mr. Doran, Mr. Stansell,

15   Mr. Carroll, Mr. Werner and Mr. Friedman, dated the 22nd day

16   of May 2014, that I will consider as the parties agreeing to

17   the accuracy of this stipulation.  All right.

18         MR. FRIEDMAN:  The last witness we would call is

19   David Williams.

20         THE COURT:  Okay.  Great.

21      Mr. Williams, if you'd come forward, please, and raise

22   your right hand.

23                   DAVID C. WILLIAMS

24      Having been sworn under oath, testified as follows:

25         THE CLERK:  Please take the stand.

 1          THE WITNESS:  Thank you.

 2          THE CLERK:  Please state your full name and spell

 3   your last name for the court reporter.

 4          THE WITNESS:  For the record it's David Carl

 5   Williams.  Last name is W-I-L-L-I-A-M-S.

 6          THE COURT:  Great.  Go ahead, Mr. Friedman.

 7          MR. FRIEDMAN:  Thank you, Your Honor.

 8                    DIRECT EXAMINATION

 9   BY MR. FRIEDMAN:

10   Q   Good morning, Mr. Williams.

11   A   Good morning.

12   Q   Where are you from?

13   A   Tacoma, Washington.

14   Q   Have you lived there your whole life?

15   A   No.  Mostly here in Seattle.

16   Q   But you currently live in Tacoma?

17   A   I currently live in Black Diamond.

18   Q   You work in Tacoma, then?

19   A   Some.

20          THE COURT:  You just want to claim Tacoma for some

21   reason?

22          THE WITNESS:  Yeah, exactly.

23   A   I work in Auburn.  I have a gun store there.  And I'm a

24   certified interpreter, so I work in court and that kind of

25   stuff a lot.

1    Q    Do you do any other kinds of work?

2    A    I do a little bit of private investigation.  We sell guns

3    and ammunition.

4    Q    Do you do work related to immigration?

5    A    I do some work related to immigration.

6    Q    In general what is that?

7    A    Mostly filling out forms, that kind of stuff.  I'm not

8    doing any of it right now, but we were before.

9            THE COURT:  When you say "filling out forms" you mean

10   helping people fill out forms for their immigration status?

11           THE WITNESS:  That is correct, Your Honor.

12   Q    People who want to immigrate into the United States, I

13   take it?

14   A    That is correct.  Before they had what they called a

15   registered immigration assistant.  And everybody in the

16   office was a registered immigration assistant.  And that

17   program doesn't exist anymore.

18   Q    Okay.  Do you know someone named Timothy Doran?

19   A    I do.

20   Q    Do you see him in the courtroom today?

21   A    Yeah.  Right there. (Indicating.)

22   Q    Could you be a little more specific?

23   A    You'd think I know, I work in court.  Yes.  He's got a

24   beige shirt on and kind of a beard.

25           THE COURT:  The record should reflect he's identified

1    the defendant, Timothy Doran.

2         MR. FRIEDMAN:  Thank you, Your Honor.

3    Q    When did you meet Timothy Doran?

4    A    I think it was around 2002, sometime.

5    Q    And how did you meet him?

6    A    Through my wife's sister's friend, which was -- that

7    friend was the aunt of the woman he eventually married.

8    Q    So a fairly indirect connection; is that's fair to say?

9    A    Correct, yes.

10   Q    Initially was it a friendship and social relationship, or

11   was it a professional relationship?

12   A    It started out as a business relationship.  But, I mean,

13   we're Vietnamese and so things are a lot more familiar, if

14   that makes any sense.  So things were just more familiar.

15   Q    But you say it started as a business relationship?

16   A    Correct.

17   Q    What was that business?

18   A    We were going to help with his immigration stuff, to bring

19   his wife, Hong, to the United States.

20   Q    And to be clear, Hong is a woman to whom he was not

21   married at the time, but was seeking assistance to have her

22   come to the United States?

23   A    Correct.

24         THE COURT:  What year was this, again?

25         THE WITNESS:  I believe it was 2002, Your Honor, or

1  thereabouts.

2  Q    And did you provide him help in doing that?

3  A    We did.

4  Q    Did Ms. Hong -- is Ms. Hong the correct way to say it or

5  is Hong better?

6  A    Hong.  However you pronounce.  It's H-O-N-G.

7  Q    Did you, in fact, help her come to the United States?

8  A    We did.

9  Q    Did Mr. Doran marry her after that happened?

10  A    Yes.

11  Q    And is she -- she is the mother of his two children; is

12  that correct?

13  A    Correct.

14  Q    After you had helped him with that immigration matter, did

15  you stay in contact with Mr. Doran?

16  A    Yes.

17  Q    Can you describe your relationship in general terms?

18  A    I mean, the immigration process is a long process

19  sometimes.  So, we were friends, and business, you know, with

20  the immigration stuff.

21  Q    And, so, for what period would you say you remained

22  friends?

23  A    Up until the time of the incident.

24  Q    When you say "the incident" are you referring to something

25  that happened in Vietnam?

1    A    Correct.

2    Q    Stepping back a little bit.  Did you know in advance that

3    Mr. Doran was going to be moving to Vietnam at some point?

4    A    As far as I know he stayed there for quite awhile.  I

5    didn't know if he was going to --

6    Q    I think I wasn't clear enough.  Initially after you helped

7    him with the immigration matter and you had a friendship that

8    carried on for some time, did you know in advance that

9    Mr. Doran was going to leave the United States and move to

10   Vietnam?

11   A    No.

12            THE COURT:  Just go to Vietnam?

13            THE WITNESS:  Yes, Your Honor.

14            THE COURT:  You knew he was going to go?

15            THE WITNESS:  Yes, I did.  On several occasions.

16   Q    When he went to Vietnam was he still married to Hong?

17   A    Yes.

18   Q    Was he still living with, not technically -- was he still

19   living with Hong when he went to Vietnam?

20   A    I don't recall.

21   Q    Do you know if his kids went with him when he went to

22   Vietnam?

23   A    I know they did on several occasions.

24   Q    There's one occasion when he was in Vietnam for a

25   considerable period of time that led up to what you call "the

1    incident"?

2    A    Um-hum.

3    Q    When he went for that trip was he still married to

4    Ms. Hong?

5    A    I don't recall.  We actually filled out some of the

6    divorce papers, and I don't -- it's been too long so I don't

7    remember what the dates are.

8    Q    But you do recall he was in the process of getting

9    divorced, it's just a timing question?

10   A    Correct.

11   Q    Did he take the children with him for that trip or that

12   stay?

13   A    If I remember correctly he took them a couple times.

14   Q    And specifically this time when he moved to Vietnam for

15   some period --

16   A    He did.

17   Q    -- did he take them with him then?

18   A    Yes, he did.

19   Q    After he moved to Vietnam, did you continue to have

20   contact with Mr. Doran?

21   A    Yes, on occasion.

22   Q    How did you do that or how did that happen?

23   A    If he needed me to send him money or he needed to ask me

24   about papers or something like that, then he would call.

25   Q    So telephone calls?

1   A    Correct.

2   Q    Was there other contact?

3   A    Maybe some e-mails or texting, something like that.  I

4   don't remember anything specific, but I'm sure there was.

5   Q    Is it fair to say primarily phone calls?

6   A    Yes.

7   Q    And were you calling him, generally, or was he telephoning

8   you?

9   A    Usually he called me.

10   Q    Are there times when you may have called him?

11   A    There could have been.

12   Q    During your phone calls with Mr. Doran, did you learn

13   about his relationship with any woman or women in Vietnam?

14   A    Yes.  I don't know how or when I learned about them.  But,

15   yes, I did.

16   Q    He told you about women with whom he was involved?

17   A    Correct.

18   Q    Was there one woman or more than one woman?

19   A    Over the course of time three that I can think of off the

20   top of my head.

21   Q    Do you recall names?

22   A    One of them was Ngoc Bich, another one was Lee, and I

23   think the other one her name was Tam or Thao, or something

24   like that.

25   Q    All right.  Now, I'd like to focus on the woman named

1    Bich.

2    A    Um-hum.

3    Q    Is her full name written out, that same person, Bich Ngoc

4    Thi Nguyen?

5    A    Yes.

6    Q    Is it fine to call her Bich?

7    A    That's fine, yes.

8    Q    To be clear, she's the woman who ultimately was killed in

9    Vietnam?

10    A    Correct.

11    Q    Did you ever speak, yourself, with her?

12    A    Um, I think I did but I'm not sure.

13    Q    Was that by phone or in some other way?

14    A    On Skype.

15    Q    And you say you think you did but you're not sure?

16    A    I think it was her, but to be honest with you I'm not

17    sure.  I can't remember.

18    Q    Okay.  Prior to the incident or prior to Bich's death did

19    Mr. Doran tell you anything about his relationship -- did he

20    tell you anything about Bich?

21    A    Yes.

22    Q    What do you recall that he told you?

23    A    Lots of -- I mean, lots of different things.  He said she

24    was -- he said that her parents were well connected in

25    Vietnam, and she was -- they were dangerous, and they were

1   kind of like part of the Mafia over there, and they could do

2   anything they wanted to.  And he said that -- at one point he

3   told me that she was -- I think he said that she was a

4   prostitute or something like that before.  And she quit that

5   scene.  You know, of course he said she was a nice gal and

6   that kind of stuff, so...

7   Q   And did he ever tell you anything about her and his

8   children?

9   A   Yes.  She watched the kids for six or eight months when he

10   came back to the United States, or for some period of time

11   anyway.

12   Q   Did he ever tell you about any threats that he believed

13   she had made?

14   A   He did, on occasion.

15   Q   Do you recall what he told you?

16   A   He said that she was jealous and that she was going to

17   have people beat him up, that kind of thing.

18   Q   Did you, apart from your conversations with Mr. Doran, did

19   you have any firsthand knowledge or any way to corroborate

20   what he was telling you?

21   A   No.

22   Q   So your only knowledge is what you heard from him?

23   A   Correct.

24   Q   You talked about -- you talked earlier about the incident.

25   When was the first time or how did you learn that Bich had

1    died or had been killed?

2    A    Tim told me.

3    Q    How did he tell you?

4    A    On the telephone.

5    Q    Did he telephone you, or did you telephone him?

6    A    He called me.

7    Q    What did you recall him saying during that first phone

8    call?

9    A    Well, there were several phone calls, so I couldn't tell

10   you which phone call it was.  But on occasion he said that he

11   needed to get out of Vietnam.

12   Q    When you say -- let's talk about the time span.  The phone

13   calls that you talked about, over roughly how long were they

14   occurring?

15   A    A couple days.  Because when it's daytime here it's

16   nighttime over there.  So it could have been a day, but it

17   might have been two or three days.  There were several phone

18   calls.

19   Q    Is it is fair to say certainly less than a week, in a

20   relatively short period of time?

21   A    Oh, yeah.  Yeah.  Probably a couple days.

22   Q    When you say "several phone calls" can you estimate how

23   many that might be?

24   A    Fifteen, twenty.

25   Q    Even if you can't recall exactly which phone call they

1  happened during, where did Mr. Doran tell you -- first off,

2  what did he tell you had happened?

3  A    Basically that she had gotten to him and he choked her

4  out.

5  Q    Do you remember that phrase specifically, "choked her

6  out"?

7  A    I do.

8  Q    Mr. Doran said that?

9  A    Correct.

10  Q    Did he tell you where this happened?

11  A    At the house.  A house that he had rented.  I know he

12  rented a house there.

13  Q    Did he tell you why Bich was at the house?

14  A    Apparently he had called her and told her to come over

15  there.

16  Q    And when you say "apparently," do you mean that he told

17  you that?

18  A    That's what he told me, yeah.

19  Q    Did he tell you what happened -- was he clear when he said

20  he choked her out that he meant he had killed her?

21  A    Yes, he was.  He told me that he had hid her somewhere.

22  Q    Did he say where he had hidden her?

23  A    I thought he said in a room, in a back room.

24  Q    Was it clear that it was in the house at least?

25  A    Yes.

1  Q   When Mr. Doran was talking about choking her and killing

2  her, did he mention anyone else being present?

3  A   No.

4  Q   Did he ever mention anyone else attacking him?

5  A   At the time of the incident?

6  Q   At the time of the incident.

7  A   No.

8  Q   Did he mention that he had attacked anyone else?

9  A   No.

10  Q   Did he mention that he had hurt anyone else?

11  A   Not that I recall, no.

12  Q   Did he ever say anything about, during that couple day

13  span, did he say anything about this having been done to

14  protect himself or being in self-defense from someone else

15  attacking him?

16  A   No.

17  Q   The only person he mentioned during those conversations

18  was Bich?

19  A   And himself, yes.

20  Q   You said Mr. Doran said he had to get out?

21  A   Correct.  That's how the conversation started.

22  Q   When he said "get out" what did he mean?

23  A   Get out of Vietnam.

24  Q   Did he ask you for help in doing that?

25  A   He did.

1    Q    For what help did he ask?

2    A    Money.

3    Q    Did you agree to send him money?

4    A    No.  I didn't have any at the time, so...

5    Q    Okay.

6    A    I told him I would see what I could do.

7    Q    Okay.  But did you ultimately send him any money?

8    A    I did not.

9    Q    Did he ask you for any other specific help?

10   A    No.

11   Q    Did you offer to do anything or think of anything that you

12   could do to help?

13   A    Well, yes.  I ultimately called the consulate.

14   Q    That's the American Consulate in --

15   A    In Ho Chi Minh City, correct.

16   Q    And what happened when you called the consulate?

17   A    I basically told them what had happened.  And I don't know

18   that they believed me at first.  And so we had a long

19   conversation about that.  And I told him who I was and that

20   kind of thing.

21       And so they asked me, do I know how to get ahold of this

22   person?  So I gave them Tim's telephone number.

23   Q    And did you tell Mr. Doran that you had provided this

24   information to the consulate?

25   A    I did.  I did.  He and I talked about it quite a bit and I

1   convinced him that it was the right thing to do to call the

2   consulate.

3   Q    And after you had put that information in Mr. Doran's

4   hands, what happened between you and Mr. Doran?

5   A    Um -- I told him that if and when he came back to the

6   United States, not to come to my house, not to contact me.

7   Q    And then did you continue having conversations with Mr.

8   Doran or did they stop?

9   A    I don't recall.  They may have continued for some time

10  with the embassy or the consulate.

11  Q    But over that same couple days, apparently?

12  A    Correct.

13  Q    After that two or three days did you have further calls or

14  did the calls stop?

15  A    They stopped.

16  Q    At some point did you learn that Mr. Doran had returned to

17  the United States?

18  A    I did.

19  Q    And roughly when was that?

20  A    Months.

21  Q    And how did you learn that he was back?

22  A    He showed up at one of my kids' workplaces.

23  Q    Did you have any reason -- from what he said, was that by

24  chance or was he there specifically because that was your

25  child's workplace?

1    A    I don't know why he was there.

2    Q    Did you have any subsequent conversation with Mr. Doran?

3    A    Yeah.  I told him that -- I called him on the phone and

4    told him that I had already told him before not to contact

5    me.  And he told me that was my kid.  He said, "That's your

6    kid, it's not you."  So I told him, dude, don't play word

7    games with me.  And I told him don't contact my kids either.

8    Q    Was that the last conversation you had with Mr. Doran

9    until, I guess the last time you saw him until today?

10   A    I think I saw him once in court up here before.

11   Q    The other time you were called here but didn't actually

12   testify?

13   A    Correct.

14          MR. FRIEDMAN:  Your Honor, may I have one moment?

15          THE COURT:  Sure.

16          MR. FRIEDMAN:  Thank you.  I have no further

17   questions.

18          THE COURT:  So when you said, "I ultimately called

19   the American Consulate in Ho Chi Minh City and told them what

20   happened," what did you tell them had happened?

21          THE WITNESS:  I told them that an American citizen

22   had killed somebody there and that they were concerned and

23   that they were in trouble.

24          THE COURT:  And then when you spoke to Mr. Doran you

25   urged him to basically turn himself in to the American

1    Consulate?

2            THE WITNESS:  I did.

3            THE COURT:  Okay.

4        All right.  Mr. Carroll.

5                        CROSS EXAMINATION

6    BY MR. CARROLL:

7    Q   Good morning, Mr. Williams.

8    A   Good morning.

9    Q   Just some follow-up questions.

10   A   Sure.

11   Q   So there were the frantic phone calls in early March of

12   2011, correct, that you've described?

13   A   I don't recall dates.

14   Q   Okay.

15   A   I'm an interpreter and so dates don't really mean anything

16   to me.  I'm sorry.

17   Q   But there was definitely the period of the frantic phone

18   calls, correct, over two days, three days maybe?

19   A   Correct.  Correct.  He called me and he was crying, on a

20   couple different occasions.

21   Q   But there were -- months earlier there were a number of

22   non-frantic phone calls, correct?

23   A   Correct.

24   Q   That you described?

25   A   Correct.

1    Q    And those included Mr. Doran's description of Bich being

2    gang-related and having a family that's connected to the

3    gangs, correct?

4    A    There was some of that, correct.

5    Q    But that was a separate time months earlier, correct?

6    A    Correct.

7    Q    And so at the time of the frantic phone calls over that

8    two, maybe three day period, you called the consulate,

9    correct?

10   A    Correct.

11   Q    And you spoke with the consulate official, correct?

12   A    Correct.  The duty officer, I think.

13   Q    Do you remember the name?  Was it Chris Davenport?

14   A    Chris sounds right.

15   Q    Chris sounds right?

16   A    Yes.

17   Q    Okay.  And you told Mr. Davenport what Mr. Doran told you,

18   correct?

19   A    Correct.

20   Q    And you described what Mr. Doran told you and that he

21   wanted to contact the consulate?

22   A    Correct.

23   Q    And when you contacted Mr. Davenport you didn't say

24   anything about Mr. Doran actually killing somebody, correct?

25   A    I don't remember what the conversation was.

1   Q   You don't recall telling Mr. Davenport that Mr. Doran

2   choked somebody out, correct?

3   A   I obviously told him.  I mean, that's why I called there,

4   so...

5   Q   Okay.  And you don't -- you didn't tell him about him

6   hiding a body somewhere in the apartment or the house,

7   correct?

8   A   I probably didn't.  Correct.

9   Q   And obviously when you called the consulate this was very

10  shortly after you spoke with Mr. Doran, correct?

11  A   Yeah.  I went back and forth between him and -- between

12  Tim and the consulate several times.  Probably four, five,

13  six times.

14  Q   And all of this happened about three years ago, correct?

15  A   Yes.

16  Q   And your memory of what Mr. Doran specifically told you

17  was probably fresher in your mind over those two, three days

18  than it is now?

19  A   Correct.

20  Q   And, in fact, you said earlier your memory is terrible

21  with timing and dates and things like that, correct?

22  A   I wouldn't say it's terrible, but it's pretty close.

23  Q   All right.  All right.

24          And when Mr. Doran called you over that frantic few

25  days, you took notes of the conversation; is that correct?

1   A    I believe I did.

2   Q    And you can't find those notes, correct?

3   A    I can't find any of them.  I've moved several times, and I

4   can't find them.  We had some other documents from some of

5   his -- some birth certificates and those kind of documents

6   from some of his girlfriends.  And it was all in a file and I

7   don't know where it is.

8   Q    And after these frantic phone calls with Mr. Doran and the

9   consulate, you told Mr. Doran to leave you alone, don't

10  contact me again?

11  A    Correct.

12  Q    And then you indicated on direct that you didn't hear from

13  him for a number of months?

14  A    Yeah.  I should probably correct that.  I told him that

15  when he comes back that he's not to contact me.  And then

16  after that there was other conversations.  But basically I

17  told him when you come back to the United States you're not

18  to contact me anymore.

19          THE COURT:  So when you say "after that there were

20  other conversations," you mean over the telephone while he

21  was still in Vietnam?

22          THE WITNESS:  That is correct, Your Honor.

23  Q    But you didn't have contact with him by telephone when he

24  came back, until that phone call after he stopped by your

25  son's workplace?

1    A    I don't believe that I did.

2    Q    All right.  And you told your family about Mr. Doran,

3    correct?

4    A    My family knows about Mr. Doran, correct.

5    Q    But you told them specifically about these frantic phone

6    calls over the two, three-day period?

7    A    I did.  Once my daughter was present and the other time my

8    son was present.

9    Q    And how old are your kids?

10   A    My daughter, she'll be 16 in August.  And my son is -- the

11   one that worked at Fry's, he's 23 now.

12   Q    So he's a little older?

13   A    Yes.

14   Q    And it was your son that reported that Mr. Doran was at

15   his workplace, correct?

16   A    Correct.

17   Q    And your son worked at Fry's?

18   A    That is correct.

19   Q    Electronics?  An electronic store that sells things like

20   computers?

21   A    Correct.

22   Q    Then you called Mr. Doran and told him to stay away?

23   A    I did.

24   Q    All right.  And you're a Vietnamese language interpreter,

25   correct?

1    A    Correct.

2    Q    And you said earlier your family is Vietnamese?

3    A    Correct.

4    Q    So you're connected to the Vietnamese community?

5    A    Yeah.

6    Q    And after these frantic phone calls and this unexpected

7    visit from Mr. Doran, you had to wonder what was going on

8    with him, whether he had been charged with something or what

9    happened with this incident?

10    A    Correct.

11    Q    And your son and daughter-in-law both work at Fry's,

12    right?

13    A    Correct.

14    Q    And you probably have a computer in your house?

15    A    I do.

16    Q    And you would be aware this would be a newsworthy incident

17    in Vietnam, correct?

18    A    I would assume so.

19         MR. CARROLL:  And is the government's binder up

20    there?

21         THE COURT:  No, but we can put it up there.

22    Q    If you could turn to tab 6, Mr. Williams.

23    A    Sure.  Yes.

24    Q    That is an article from the newspaper, an on-line

25    newspaper *Very Vietnam*, right?

1    A    Yes.

2    Q    And this is an English language website that covers news

3    in Vietnam?

4    A    Yes.

5    Q    And the article, if you look at the very bottom of the

6    page where it shows the Internet address, it was published

7    back in March of 2011?

8    A    Yes.

9    Q    And this article includes details about the investigation

10   in Vietnam, correct?

11   A    Correct.

12   Q    And it also gives the name of the victim in Vietnam,

13   correct?

14   A    Correct.

15   Q    And this is -- and you spoke with Inspector Stephenson,

16   correct?

17   A    Yes.

18   Q    And you also gave Inspector Stephenson the name Bich,

19   correct?

20   A    Correct.

21   Q    And in the time period -- when you spoke with Inspector

22   Stephenson, that was at least a year after this two,

23   three-day period of frantic phone calls, correct?

24   A    Okay.  Yes.

25   Q    It was sometime after, correct?

1  A    Yes.

2  Q    And the date might not ring.

3       So in that period of time you talked with your family

4  about Mr. Doran, correct?

5  A    Correct.

6  Q    And you told them specifically about what he had told you,

7  correct?

8  A    Correct.

9  Q    And the information was available on the Internet about

10  what the specific allegations were in Vietnam?

11  A    Correct.

12       MR. CARROLL:  If I just may have a moment, Your

13  Honor.

14       THE COURT:  Sure.

15       MR. CARROLL:  No other questions.  Thank you.

16       THE COURT:  Anything else, Mr. Friedman?

17       MR. FRIEDMAN:  Very briefly, Your Honor.

18       THE COURT:  Sure.

19                    REDIRECT EXAMINATION

20  BY MR. FRIEDMAN:

21  Q    Mr. Williams, I want to turn you to the series of phone

22  calls that took place after the incident.  Do you have any

23  doubt that Mr. Doran told you that he had killed Bich, during

24  those phone calls?

25  A    No.

1    Q    Do you have any doubt he told you he had choked her out?

2    A    No.

3    Q    Do you have any doubt that he told you that he had hidden

4    her body somewhere in the house?

5    A    I do not.

6    Q    When you called the consulate shortly after that, were you

7    trying to help Mr. Doran?

8    A    Yes.  I was trying to help several people.  But, yes.

9    Q    One of them was Mr. Doran?

10   A    Yes, correct.

11   Q    Could that have affected what you said to the consulate or

12   how detailed you were about Mr. Doran's actions?

13   A    It could have.

14   Q    Can you explain how that would be?

15   A    I mean the guy is a friend of mine, so, I mean, that's --

16   you try to do what's right and let everybody else sort that

17   kind of thing out.

18   Q    Were you trying to minimize what he had done, his conduct

19   during that time with the consulate at all?

20   A    Something like that is pretty hard to minimize.  But,

21   yeah, I told them as little as possible.  I've had to deal

22   with the consulate and the embassy quite a bit myself.  So

23   you tell them as little as possible, I guess.  I mean, I

24   wouldn't have called them if I didn't have some concern about

25   it.

1    MR. FRIEDMAN:  Thank you.  I have no further

2    questions.

3                        EXAMINATION

4    BY THE COURT:

5    Q   Mr. Williams, do you remember anything else about the

6    first conversation.  I think you started out by saying,

7    "First of all Tim said I need to get out of Vietnam."  Was

8    that before or after he told you, "She got to me," or

9    something like that?

10   A   Yeah.  That was before, Your Honor.

11   Q   So it started out with, "I need to get out of Vietnam."

12   You asked him why, he says --

13   A   That's correct.

14   Q   What does he say when you asked him why?  Did you say

15   something like, "She got to me?"

16   A   Yeah.  He told me that, "She finally got to me."  And that

17   was at some point.

18   Q   Okay.

19   A   And I don't remember when it was, Your Honor.

20   Q   And then he said, "I choked her out?"

21   A   Correct.

22   Q   Now, this is a friend of yours telling you, according to

23   you, that he had just killed a woman?

24   A   That is correct.

25   Q   What was your reaction?

1    A    I told him not to come to my house again.

2    Q    Okay.  But, I mean, did you say like, "What?  You did

3    what?"  Or, "Tim, what happened?"  Was there any reaction

4    like that?  Or were you sort of on your guard already?

5    A    I guess in a way I wasn't surprised.  I mean, I kind of

6    know his background and stuff.  I have hope for people that

7    have different backgrounds.  And so you try to think the best

8    of people and maybe that's why we're all here.  But sometimes

9    it doesn't end up like that, as I'm sure Your Honor knows.

10   Q    Okay.  And as we sit here now are you afraid of him?

11   A    No.

12            THE COURT:  Anything else, Mr. Friedman?

13            MR. FRIEDMAN:  No, Your Honor.

14            THE COURT:  Mr. Carroll?

15            MR. CARROLL:  No, Your Honor.

16            THE COURT:  All right.  Thanks, Mr. Williams.  I

17   appreciate you coming in.

18            THE WITNESS:  Thank you, Your Honor.

19            THE COURT:  You're excused.

20       So, Mr. Friedman and Mr. Werner, that completes your

21   presentation of the live testimony?

22            MR. FRIEDMAN:  It does, Your Honor.

23            THE COURT:  And also from the defense, Mr. Carroll,

24   you've finished your live testimony?

25            MR. CARROLL:  Yes.

1           THE COURT:  I have the exhibits and the testimony.  I

2    think that the plan that we decided on is that the court

3    would first address the issue of whether or not the

4    government had met a burden of clear and convincing evidence

5    to establish the violation that he committed the murder in

6    Vietnam, and that we would have a briefing schedule where

7    that issue would be raised.  Then an oral argument on that

8    issue.  And then depending on which way the court ruled on

9    that violation -- not violation -- but that aspect for

10   sentencing purposes, we would then set a sentencing down the

11   road so the defense and the government knew what we were

12   dealing with; is that right?

13           MR. FRIEDMAN:  Yes.  Except we've spoken to defense

14   counsel.  I don't think we feel that we need oral argument

15   after we submit the briefs.  The court has heard a lot.

16           THE COURT:  Okay.

17           MR. FRIEDMAN:  We think briefs will do it.

18           THE COURT:  All right.  So, we'll set a briefing

19   schedule, the court will issue its ruling on that.  Then we

20   will set a sentencing date eight weeks down from there to

21   conduct -- well, I don't know, do we need -- we have a

22   presentence report already, right, Mr. Facklam?

23           THE PROBATION OFFICER:  We do, Your Honor.

24           THE COURT:  Yeah.

25           THE PROBATION OFFICER:  It's been indicated to me

1  that there might be some objections.

2          THE COURT:  I'm just trying to say from whenever the

3  court makes its decision, how much time do you want,

4  Mr. Carroll, about four weeks, six weeks, eight weeks?

5          MR. CARROLL:  I think at most four weeks.  Once we

6  know the court's determination as to that aspect, I don't

7  think that --

8          THE COURT:  Have you discussed with each other a

9  briefing schedule for presentation of the issue?

10          MR. FRIEDMAN:  I think a joint submission would make

11  the most sense.  And I don't know if the court wants replies

12  after that.

13          THE COURT:  I think joint submissions in one fell

14  swoop would be great, understanding that if something came up

15  you could certainly call and ask for leave to file a

16  two-or-three-page reply or rebuttal, whatever.  So how much

17  time do you need for the joint submittal?

18          MR. CARROLL:  We were discussing something like June

19  11th as the date.

20          THE COURT:  Whatever you agree on in June is fine

21  with me.

22          MR. FRIEDMAN:  June 11th would be fine.

23          THE COURT:  June 11th it is.

24      Okay.  So is there anything else you need from me this

25  morning, Mr. Carroll?

1           MR. CARROLL:  No, Your Honor.

2           THE COURT:  Mr. Friedman?

3           MR. FRIEDMAN:  No, Your Honor.

4           THE COURT:  Well, I appreciate it.  Thanks very much.

5    Then we will be adjourned.

6

7                 (The proceedings were adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8

9

10

11

12    /s/ Debbie Zurn                    May 29, 2014

13    Debbie Zurn, Court Reporter             Dated

14

15

16

17

18

19

20

21

22

23

24

25