1                 UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4  _____

5  UNITED STATES OF AMERICA, )   NO. CR12-001 RSL
                             )
6              Plaintiff,    )
                             )
7  vs.                       )   October 2, 2014
                             )   Seattle, Washington
8  TIMOTHY DORAN,            )   1:30 p.m.
                             )
9              Defendant.    )

10 _____

11       TRANSCRIPT OF FELONY SENTENCING PROCEEDINGS
          BEFORE THE HONORABLE ROBERT S. LASNIK
12          UNITED STATES DISTRICT COURT JUDGE
   _____

13

   For the Plaintiff:        MR. BRIAN WERNER
14                           -and-
                             MR. ANDREW FRIEDMAN
15                           Assistant United States Attorney
                             700 Stewart Street, #5220
16                           Seattle, Washington 98101

17

   For the Defendant:        MR. DENNIS CARROLL
18                           Federal Public Defender
                             1601-5th Avenue, Ste 700
19                           Seattle, Washington 98101

20 U.S. Probation Office:    MR. MICHAEL MARKHAM
                             U.S. Probation Officer
21

22 Court Reporter:           Leslie A. Waltzer, CSR
                             3641 North Pearl Street
23                           Tacoma, WA 98407

24

25       (Proceedings recorded by mechanical stenography;
   transcript produced with aid of computer.)

```
 1   (Defendant Present, in Custody)

 2           THE CLERK:  All rise.  Court is again in

 3   session, the Honorable Robert S. Lasnik presiding.

 4           THE COURT:  Good afternoon.  Thank you.  Please

 5   be seated.

 6           THE CLERK:  Case CR12-001 RSL, United States v.

 7   Timothy Doran.  Counsel, would you please make your

 8   appearances.

 9           MR. WERNER:  Good afternoon, Your Honor.  Brian

10   Werner and Andrew Friedman on behalf of the United

11   States.  With us at counsel table is Inspector Lisa

12   Stephenson from the United States Marshals Service.

13           THE COURT:  Hi, Mr. Werner, Mr. Friedman and

14   Ms. Stephenson.

15           MR. CARROLL:  Good afternoon, Your Honor.

16   Dennis Carroll on behalf of Mr. Doran.

17           THE COURT:  Hi, Mr. Carroll and Mr. Doran.

18       And we have Michael Markham from U.S. Probation.

19       We're here for sentencing on Mr. Doran's plea of

20   guilty to one count of Failing to Register as a Sex

21   Offender.  The Court has conducted a lengthy evidentiary

22   hearing that related to the allegation that Mr. Doran had

23   committed an illegal homicide in Vietnam involving a

24   woman who he dated there and who cared for his children.

25   I've issued an order regarding the sentencing hearing
```

1   that went out at the end of August, which found that the

2   Court was satisfied by clear and convincing evidence that

3   Mr. Doran did kill Ms. Ngoc in Vietnam, and that the

4   Court would consider the parties' arguments regarding the

5   appropriate weight to give to this finding in the context

6   of all the factors identified in 3553, mitigating and

7   aggravating circumstances and within the Guideline range

8   for this crime, and I have since received additional

9   briefing from both the government and from the defense

10   and then a Supplemental Sentencing Memorandum from the

11   defense.

12       I'm not going to list every document that I looked

13   at, because there are so many that are in the court file,

14   but all the material going back to the first scheduled

15   sentencing and right through to today I have reviewed in

16   preparation for the sentencing, including, of course,

17   Mr. Facklam's original U.S. Probation Presentence Report

18   and the various letters that Mr. Doran has submitted to

19   me through the years and the pictures of the children

20   which were submitted to me previously too, which I'm

21   happy to return to Mr. Doran.

22       I know that there are issues that we have to deal

23   with also later in regard to return of property,

24   designation of a facility, timing of the commitment, et

25   cetera, but we'll deal with those right after the

4

1   sentencing.

2       In terms of the materials that were submitted since

3   the order that the Court entered at the end of August,

4   Mr. Carroll, do I have everything you wanted me to have

5   in preparation for the sentencing?

6           MR. CARROLL:  Yes, Your Honor.

7           THE COURT:  And have you had an opportunity to

8   go over the government's reports since then with

9   Mr. Doran and make any additions or corrections?

10          MR. CARROLL:  Yes, Your Honor.

11          THE COURT:  All right.  Mr. Doran, are you ready

12  to proceed to sentencing today?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  All right.  Mr. Werner?

15          MR. WERNER:  Thank you, Your Honor.

16      And appreciating that Your Honor has, as you said,

17  received substantial briefing, substantial evidence and

18  issued a substantial ten-page order on this case, I know

19  that Your Honor is very familiar with the facts of this

20  case and the law that has been referenced in this case,

21  but I still would like to discuss three things today,

22  Your Honor.

23      First, I want to discuss the -- the Guideline, the

24  fact that you can -- this Court can sentence Mr. Doran --

25  the law provides for this Court sentencing Mr. Doran

1  above the Guideline in this case.  Second, the Court

2  should sentence Mr. Doran above the Guideline in this

3  case and, third, I'm going to advise the Court of the

4  government's position related to supervised release

5  conditions that were objected to in the defense's

6  Sentencing Memorandum.

7          THE COURT:  Great.

8          MR. WERNER:  Your Honor, this Court can impose a

9  ten-year sentence in this case.  The Ninth Circuit law,

10  while it is straight forward I think on this point, there

11  are two things that a sentencing court's discretion is

12  reined in by.  First, there must be no procedural error;

13  that is, the Court must correctly calculate the

14  Guideline.  The Court must not rely on any clearly

15  erroneous facts.  There must be no procedural error.  And

16  the second thing is the Court's sentence must be

17  substantively reasonable.  And, again, as the Court -- as

18  the government stated in their Sentencing Memo,

19  substantive reasonableness is not a point, but is a --

20  but is a range.

21      There are many cases cited by the government to Your

22  Honor that say the Court may vary above the Guideline

23  range, and there are many cases cited by the Court and

24  many cases in my experience and probably the Court's

25  experience where the Court has varied -- this Court and

1   other courts in this district have varied below the

2   Guideline range.  Reasonableness is a range, not a point.

3       Many -- one of those cases the defense wants to cite

4   to this Court -- has cited -- is the *Allen* case.  And,

5   again, I don't want to belabor it, because I think the

6   Court addressed it in its ruling, saying that, you know,

7   the *Allen* case -- the Court does respect the *Allen* case

8   or is going to follow the *Allen* case in the extent that

9   you realize -- the Court realizes it's somewhat

10  constrained in how much weight it can give to the murder

11  that was committed by Mr. Doran in this case.

12      But I do want to point out that the *Allen* case is

13  very factually different than the case we have before us

14  today.  The *Allen* case involved a 360-month sentence that

15  was imposed on the defendant in that case for conduct

16  that was not proved by -- not an actual murder, but

17  conduct describing the desire to murder.  And, finally,

18  the sentencing in that case was different from this case

19  in another way.  That court actually adopted the

20  Guideline range as if it was deciding a criminal sexual

21  abuse.

22      None of those three things are at play here.  This is

23  not a 360-month sentence the government is asking for.

24  It's conduct that actually occurred.  A woman is dead.

25  And, finally, the Guideline -- the government is not

1   asking that the Court use the Guideline range that would

2   be in play for murder in this case.

3       Again, there are cases above the Guideline, there are

4   cases below the Guideline, including the case of *Fitch*,

5   which is the Ninth Circuit case that the Court has also

6   referred to in its rulings in this case.  That's a case

7   where a 262-month sentence, a 22-year sentence, was

8   imposed for bank device -- for bank fraud and access

9   device fraud.  Again, the law I think is clear that the

10  Court can vary from the Guideline range and should tie

11  that variance to 33 -- to 3553(a) factors.

12      I want to talk next about those factors and why the

13  Court should vary from the Guideline range in this case.

14  The history and characteristics of Mr. Doran, the need to

15  deter Mr. Doran from future conduct, future criminal

16  acts, and the need to protect the public from Mr. Doran

17  are the three factors in Guideline -- in 3553(a) that the

18  government has pointed to that counsel for a sentence of

19  ten years here.  I think there's three specific things

20  that the Court can cite for -- three things that came up

21  during the proceedings in this case that the Court can

22  cite.

23      The first is the murder of Bich Ngoc Nguyen in Trang,

24  Vietnam in March 2011 by the Defendant.  This was a woman

25  that the Defendant was dating.  This was a woman that the

1   Defendant choked with his hands, murdered.  This is a

2   woman that the Defendant rolled up in a rug, hid in his

3   house, and then fled the country.  This is a woman

4   that -- who was -- the Defendant had been in a

5   relationship with, and the Defendant, rather than

6   providing any sort of self-defense justification for

7   this, immediately began telling stories to justify to

8   others and probably to himself, Your Honor, why he had

9   committed this horrendous act.

10       A man who could commit a murder like this with his

11  bare hands, hide the woman in a -- throw a woman in a rug

12  in a closet and then leave the country, this is a man who

13  deserves to be in prison for ten years.  A man who could

14  make such calculated decisions to quickly leave the

15  country, to try to talk to others, to try to set up a

16  possible self-defense justification, this is a dangerous

17  man, a man who should be sentenced to ten years.

18       But it's not just the fact that this is one murder,

19  this is one act -- this is one act of anger that's

20  separate, that is different from Mr. Doran's character,

21  the characteristics that have been shown to this Court.

22  His criminal history has two other similar incidents in

23  its past.  In 1990, Your Honor, the Defendant assaulted

24  his then wife.  He hit her, he kicked her, he bit her.

25  In 1992 he assaulted by raping his ex-girlfriend.  He

1    twisted her legs.  He raped her.  He began to -- he

2    inserted foreign objects in her, and he turned on the gas

3    and left her to die.  Then the third incident, again, was

4    the choking and murdering death of his ex-girlfriend in

5    Vietnam.  Three horrible instances of domestic violence.

6    Three escalating incidents of domestic violence.

7        This is a violent man who seeks the control of people

8    he's in relationships with and acted out on those -- his

9    inability to control his own impulses at least those

10   three times.  A sentence of ten years is appropriate for

11   someone with this criminal history, this type of criminal

12   history.

13       The third thing I'd like to point to, Your Honor, is

14   the statute itself that's at issue in this case.  2250(c)

15   talks about the five years -- in addition to any sentence

16   that should -- that's imposed on 2250(a), which is a

17   failure to register, 2250(c) talks about imposing at

18   least an additional five years on someone who commits a

19   crime of violence while unregistered.  That's what

20   Mr. Doran did.  Now, it doesn't technically apply here,

21   because Mr. Doran wasn't in the United States when he

22   killed Ms. Nguyen.  But that's, I think, a strong

23   indication of the fact that the sentence of ten years --

24   five years -- at least five years for the murder and five

25   years or something less than that on the underlying

1    failure to register, for a total of ten years, is a

2    substantially reasonable sentence.

3         Finally, Your Honor, I want to talk about the

4    supervised release conditions that were proposed by the

5    Probation Office and objected to by the defense.  Your

6    Honor, the government does not -- does not think that --

7    it would be -- accepts the Court not imposing a financial

8    condition in this case; that is, access to Mr. Doran's

9    financial records.  That's not what this case is about.

10   Although it is a good way to keep track of people by

11   keeping -- having access to financial records, the

12   government does not -- would not resist the Court

13   striking that condition.

14        The government does believe that MRT, Moral

15   Reconation Therapy, is justified here.  The government

16   does believe that drug and alcohol testing is advisable

17   here, especially given Mr. Doran's past history with

18   steroid abuse.  I think that's something that the

19   Probation Office -- a tool that the Probation Office

20   should have in their kit, and the government does believe

21   that mental health treatment should be provided -- should

22   be ordered as a condition for Mr. Doran.

23        I think the -- it was the defense Sentencing Memo

24   that mentioned that the FTC has diagnosed him -- or he

25   gave an indicated of having PTSD.  I think that alone is

```
 1    justification for ordering a mental health evaluation as
 2    one of the conditions of supervised release for
 3    Mr. Doran.
 4        As for the sex offender conditions, the government
 5    actually doesn't -- agrees with the defense.  A lot of
 6    those conditions do not apply here.  In fact, all of
 7    them, with the exception of one that's the condition --
 8    proposed condition number nine, which orders a sexual
 9    deviancy evaluation.  The government, after consulting
10    with Mr. Markham, does think that that is an appropriate
11    condition to keep in this case.  The government would be
12    okay with excising the two parts that the defense finds
13    objectionable; that is, physiological testing, I don't
14    think, is needed -- necessary to be ordered by the Court
15    and the -- the idea of turning over past evaluations to
16    the Court.  The government is -- also would not object to
17    the Court excising that part of the condition as well.
18        But, again, the government does believe that allowing
19    the Probation Office to order a sexual deviancy
20    evaluation is something that the Probation Office should
21    be allowed to do here.  While failure to register isn't a
22    sex offense, Mr. Doran is a sex offender.  He committed a
23    sex offense, and this standing alone I think is
24    justification for a sexual deviancy evaluation under the
25    limited way I've described it.
```

```
 1        Again, for the rest of the conditions, the rest of
 2    the sex offender conditions, Your Honor, the government
 3    does not support -- is okay with those being excised from
 4    the Judgment in this case.  That's because, Your Honor,
 5    Mr. Doran's crime are not about sex.  They're about
 6    control.  Mr. Doran is a serial abuser of women.  He is
 7    someone who is violent.  He is someone who has sought to
 8    control the women in his life by violence, and he is
 9    someone who is dangerous, who is a threat to the public.
10    The Court should sentence him to the maximum sentence
11    available, that is, ten years.
12             THE COURT:  Okay.  Thanks, Mr. Werner.
13        Mr. Carroll?
14             MR. CARROLL:  Thank you, Your Honor.
15        As the Tenth Circuit said in Allen, this is not an
16    easy case.  It's not an easy case under Booker, nor do I
17    think it's as easy a case as the government would portray
18    it to be.  They indicated, well, it's straight forward
19    under Booker, but I don't think, looking at the Allen
20    case, that it's so straight forward.
21        Under Allen the Court does not have free rein under
22    3553 to make an extraordinary variance based on unrelated
23    and uncharged conduct.  It's tempting.  I understand it's
24    tempting to use the homicide as a means to punish
25    Mr. Doran further for that -- for the murder,
```

1    particularly in a case like this where there's, at least

2    right now, no extradition treaty.  And there may be one

3    in the future, but there doesn't seem to be one that's

4    going to happen anytime soon.  But the Court can't do

5    that.

6        And the government couches their language in the

7    3553(a) factors, but the reality is that they're asking

8    for punishment.  As Mr. Werner said when he's describing

9    the murder, this is someone who committed a murder,

10    deserves to be in prison for that murder, and that's

11    explicitly trying to punish Mr. Doran for that, although

12    they do couch it in the 3553 factors.

13        And to be clear, I'm going to say this for the

14    record, but I'm also saying it for Mr. Doran.  Mr. Doran

15    objects to the Court's finding that he committed this

16    homicide.  He is adamant that he is innocent of this

17    homicide, and that he did not do this homicide, and that

18    he should not be punished for it, and it should not be a

19    factor in any way, shape or form here before this Court.

20        As his lawyer I'm cognizant of the Court's order and

21    the subsequent order that that factual issue is closed at

22    this point in time.  And under *Allen* and Ninth Circuit

23    case law, *Fitch*, we have the relatedness principle where

24    the Court has to first begin with the Guidelines.

25    They're the benchmark, the anchor, with which this Court

1    must begin its sentencing analysis.  There's no dispute

2    here.  Everyone agrees the range is 18 to 24 months.

3    And, yes, under *Booker*, this Court has the authority to

4    vary from the Guidelines, but it's not unfettered.

5         And it's kind of ironic that the government now can

6    use *Booker*, which is a case that protects defendant's --

7    their Sixth Amendment rights and their Fifth Amendment

8    rights to have juries determine particular facts that are

9    used to -- in the sentencing process to enhance their

10   sentence, and that *Booker* decision is now being flipped

11   in this case to use uncharged, unrelated conduct that a

12   jury has not been asked to decide as a significant or

13   primary reason to enhance Mr. Doran's sentence.

14        And I think *Allen* is clear.  *Booker* does not sanction

15   an end run around the Fifth and Sixth Amendments.  It

16   puts a limit on the Court's ability.  Particularly in a

17   case where it's unrelated offense conduct, unrelated to

18   the underlying conviction, I should say, the Court cannot

19   simply just have free rein.  Now, in *Allen* there's no

20   mechanical or mathematical formula that the court gives

21   us, but the court was clear that dramatic variances based

22   on unrelated, unadjudicated conduct can violate the Fifth

23   and Sixth Amendment.

24        Now, what *Allen* does do, although they reluctantly

25   approve of it, is the horizontal departure that I

1    suggested in my -- my Memorandum.  Now, they say it might

2    be reasonable for the district court to consider *Allen's*

3    uncharged conduct as a factor bearing on offender

4    characteristics under Chapter 4.  Although a stretch, it

5    would be at least faithful to the Guidelines.  And here

6    the government and the Probation Department's

7    recommendations are completely untethered from the

8    Guidelines.  There's no hook into the Guidelines.  They

9    agree that it's 18 to 24, but say forget about it.

10        Now, what I've suggested is if the Court is inclined

11   to a horizontal departure -- now, to be clear, Mr. Doran

12   is not conceding that a horizontal departure to a higher

13   criminal history category is warranted.  When Mr. Doran

14   was released from prison in 1998, all the way up to 2011,

15   there's no indication that he was engaged in criminal

16   conduct.  No contact with police.  No arrest.  Now, the

17   government has attached to its Memo a restraining order

18   that his ex-wife got during the course of a divorce and

19   custody dispute.  Now, I attached the ultimate custody

20   order where Mr. Doran, after all that was aired before a

21   superior court judge, got custody of his kids, so I would

22   suggest the allegations of -- the government's argument

23   that he's been abusing women for all that time is simply

24   unwarranted in light of that evidence.

25        I've also provided the Court with a polygraph

1    examination that was done, I believe, in 2009 that

2    indicated that Mr. Doran had not been engaging in any

3    criminal acts since his release from prison.  Also, there

4    are numerous letters indicating that Mr. Doran is a good

5    father.  He's someone who cares about his children and,

6    frankly, I haven't had -- I don't think I've had a single

7    meeting or conversation with Mr. Doran where he's not

8    brought up his children, his concern for his children,

9    and the impact that all of this is having on his

10   children.

11       But getting back to *Allen* and the horizontal

12   departure.  Assuming the Court wanted to factor in that

13   Assault 2 in 1990 that doesn't score his criminal

14   history, and even the homicide, which would at most add

15   another three levels, his range is, like, 27 to 33

16   months, and we would make a recommendation at the high

17   end of that range.  And *Allen* approved of this method.

18   It's -- at least it's tied to the Guidelines.  It has

19   some grounding.  It's anchored in the Guidelines.

20       Now, the government cites a number of cases where

21   courts did vary from the Guidelines.  I would point out a

22   few things about those cases.  Most of those cases were

23   variances that were not proportionally as extreme as the

24   one we have here.  I think there was one that was

25   similar.  It was someone with a range of 135 months, and

1    the court imposed probation.  In that case the reason for

2    the downward variance was because of the offense-related

3    conduct.  That person during the course of the offense

4    was a passive participant in the offense.  And I think

5    the thread going through all of those, in addition to the

6    magnitude was not so great as what the government is

7    asking for, is that the variances were either based on

8    the actual offense conduct that took the case out of the

9    heartland, or the criminal history which was actually

10   adjudicated, and here what the government is relying on

11   and Probation, is an unadjudicated, unrelated offense

12   that is completely different from this particular case.

13       The government cites the *Fitch* case.  I think the

14   *Fitch* case is a good contrast, because in that case the

15   defendant killed the person in order to effectuate the

16   fraud.  It was explicitly found to be specifically

17   related to that particular offense conduct, so the

18   variance was approved.  I would note that that variance

19   was only two-and-a-half times what the Guidelines range

20   was here.  The government's variance is five times what

21   the Guidelines range is here.  The government --

22            THE COURT:  Mr. Carroll, could I ask you a

23   question on the relatedness issue?  If the Defendant had

24   gone to another state and not registered as a sex

25   offender and then started a relationship with a woman,

1    and there was a violent crime that came out of that,

2    wouldn't that be considered related to the failure to

3    register as a sex offender?  Because the statute actually

4    has a specific punishment for if you commit a violent

5    crime in conjunction with your failure to register.

6        I mean, it may be a fiction to think that women are

7    actually checking the registry, but that is part of the

8    reason why we have a registry, is that so people can

9    check it and see if there's a dangerous person either in

10   the community or someone they're about to date.

11         MR. CARROLL:  Well, I would say that

12   initially -- well, 2250, I think, is distinguishable in

13   that situation, because Mr. Doran would actually have the

14   right to have the jury decide the crime of violence.

15         THE COURT:  Sure.  But if they did, wouldn't it

16   be a related crime?

17         MR. CARROLL:  I -- I wouldn't suggest that -- I

18   don't think it would necessarily be a related crime.  It

19   wouldn't be very related to the fact of not registering.

20   This Court has found that Mr. Doran's homicide was not

21   related to the failure to register offense.

22        I don't know if the fact that it was in Vietnam also

23   is another distinguishing factor in that you would have

24   no duty to register there as a sex offender either.  But

25   if you look at the cases in *Fitch* and -- and the other

```
1   cases cited by the government, the thread is that, A, the
2   variances weren't that much and, secondly, the variances
3   were based on the actual offense conduct or something
4   that was adjudicated in their criminal history.
5        Regarding the supervised release conditions, I was
6   prepared to go on, and now in light of the government's
7   concession, I'll try to cut my comments short.
8            THE COURT:  Let me just ask Mr. Werner one thing
9   I didn't press him on.  Do you agree that it's five years
10  and not lifetime on the term of supervised release?
11           MR. WERNER:  Yes.  I believe the Guideline term
12  is -- I think the maximum term the Court can impose is
13  life.
14           THE COURT:  You still think there is that
15  possibility?
16           MR. WERNER:  Yes, Your Honor.  But as we said in
17  our Memo, I think the Court would need to justify why the
18  Court would want more than five years at this time, so
19  there's --
20           THE COURT:  Okay.  I just want to make sure on
21  that.
22        So you can certainly argue that one, Mr. Carroll.
23           MR. CARROLL:  Thank you, Your Honor.
24        The government bears the burden of showing that it's
25  necessary and also the conditions must involve no greater
```

1    deprivation than necessary.  I think there's a tendency

2    to view supervised release conditions as something that's

3    helpful for the defendant and -- forgetting that these

4    are -- particularly sex offender conditions and

5    evaluation conditions, they're onerous.  They are things

6    that are part of the punishment, and harsh conditions can

7    actually negatively impact a person's reentry into

8    society.

9        Regarding the length of the supervised release,

10    Mr. Doran would ask the Court to impose just five years.

11    That's what the Guidelines says.  A lifetime period of

12    supervision is an extraordinary departure from that

13    Guidelines recommendation.  Courts who have looked at sex

14    offender conditions have noted one of the factors to

15    consider is the remoteness of the prior sex offense, and

16    here we have a situation where Mr. Doran's last sex

17    offense was in 1992.

18        Regarding the specific treatment condition that the

19    government recommends -- again, the government agrees

20    that this case isn't really about sex offending.  It's

21    more about power and control.  Mr. Doran, of course,

22    would object to that, and we don't concede that, but

23    there has to be a showing that a sex offender evaluation

24    is particularly needed in this case.

25        Mr. Doran did see a therapist when he was both in

1    prison and out of prison, Sally Wing, who's a certified

2    sex offender treatment provider, so he has had some

3    counseling, he's had some therapy in the past to address

4    primarily anger issues, and an evaluation simply would

5    not be warranted in this case.

6            THE COURT:  Mr. Carroll, I noticed only in

7    preparation for the sentencing in the last couple of days

8    that on the Judgment and Sentence out of Pierce County

9    for the rape, there's a reference to conditions to be

10   imposed consistent with the report of Dr. Harris.  And I

11   assume that's Dr. G. Christian Harris who did psycho and

12   sexual evaluations back in the -- in that timeframe.  Are

13   you aware of anything about that report?

14           MR. CARROLL:  No, I'm not aware.  I don't have

15   that -- that report.

16           THE COURT:  Okay.  You don't have it either, of

17   course, or I would have seen it, Mr. Werner?

18           MR. WERNER:  No, we don't.

19           MR. CARROLL:  And I would point out that he

20   finished his supervision for that offense.  He complied

21   with all of the conditions, and they closed his community

22   supervision on the case as part of that 13-year period

23   when he was doing well in the community.

24       So in closing, Your Honor, the Court's required to

25   impose the minimum term necessary to achieve the goals of

1    sentencing.  Ten years is more than is necessary.  It is

2    also too extraordinary of a variance based on unrelated

3    and uncharged conduct, so we would ask for the Court to

4    impose 33 months.  And we would also object to the -- the

5    evaluation conditions, the mental health conditions, the

6    length of community -- of supervised release recommended

7    by the Probation Department, and the MRT condition.

8              THE COURT:  Okay.  Thanks very much,

9    Mr. Carroll.

10        And I know that some of your research attorneys are

11   probably the ones who unearthed some of those relatedness

12   cases also, so well done for the public defender's

13   research lawyers.

14        Mr. Doran, is there anything you want to say today

15   before I impose the sentence?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Okay.  Would you go to the podium.

18             THE DEFENDANT:  I know that today you're going

19   to sentence me, and I hope it's for the crime that I

20   committed by going out of state to provide for my kids to

21   work.  As far as the Vietnam issue, I really think

22   there's a whole lot of evidence, physical evidence

23   especially, that didn't get as much weight given to it as

24   it should have.  There's more to this story than -- than

25   what was brought out to you.

1        This woman never watched my children.  Sure, I dated

2   her.  I was in a relationship with her.  But she wanted

3   me to bring her to America, and I had no plans to do

4   that.  I think it's imperative to know that at the same

5   time that she was going out with me, she was also engaged

6   with -- with a man from Australia.

7        I'm really hoping this Court does not misconstrue

8   what I'm saying.  I'm not trying to discredit her all.

9   What I'm trying to do is explain.

10        This woman was intent on getting out of Vietnam by

11   any means necessary.  I met her by helping her when she

12   got hit by a taxi, and started a relationship after that.

13   But the things that took place, the way that she was when

14   she was around my children, I -- I couldn't have that,

15   and the fact that she -- she was intent on pushing the

16   issue for me to bring her to America, and then when I

17   ended up breaking up with her, she sent the gangsters

18   after me and followed us and had my children threatened.

19   And there's evidence that -- that wasn't provided to you

20   that clearly states that people were aware of this.  And

21   the investigation that went on in Vietnam, it -- I don't

22   know -- I don't know how to explain it to you so you

23   understand, but it works completely differently over

24   there, and to say, "cover up," is an understatement.

25        I think that -- that if this would have been

1    investigated when I first came in -- I know that due to

2    the budget restraints and everything, it took three years

3    to be able to get financing to send Mr. Stansell over

4    there.  But given the fact of what happened to him when

5    he got there as far as being able to do the

6    investigation, I think that -- that has a lot to do with

7    this.  Plus the physical evidence that -- that -- I

8    never -- have never and will never deny that they came

9    into the house, and they attacked me and my children, and

10   I protected my children.

11       Did I kill her?  Absolutely not.  Did I wrap her in a

12   blanket like they said, and wrap her head in a bag and

13   stuff her in a closet?  Absolutely not.  And there's not

14   one piece of physical evidence that the government or

15   anybody else has provided to me to be able to prove that

16   unequivocally I'm responsible for it instead of the other

17   people that I have stated from the very beginning that

18   are involved with this.

19       There was a credit card found at the scene.  There

20   was an unidentified handprint on the storage door to

21   where her body was found.  And I'm sorry that she died,

22   but I am not the one that put her in the physical

23   condition that they found her.

24       They're -- from the very beginning I tried to aid the

25   investigation by sending my business partner information

1   to the police to -- with names and phone numbers of two

2   women who -- who were local that saw Ms. Ngoc bring the

3   gangsters after me.  And she went and talked with them

4   and was asking where I was.  When I was at the consulate,

5   they called me and told me that it was not safe for my

6   children and myself to return there.  Her boss even says

7   that -- that she was aware of the fiancé in Australia,

8   and asked her why she wasn't just going to stay with him,

9   and she said that she wanted to come to America instead

10  of Australia; that there was no -- there was no guarantee

11  that Australia was going to -- going to happen.

12      My point is this:  Yeah, I protected my kids.  I

13  didn't kill anybody, though, and there's no physical

14  evidence that's been shown.  The only blood that was

15  found at the scene was from my son when she was beating

16  my son, Your Honor.  I don't know what I can say.

17  They -- they would not let me bring forth the evidence

18  that I wanted to bring forth that I think this Court

19  should have been aware of to be able to make your

20  decision.

21      And I understand that you found me guilty based on

22  the limited amount of evidence that you were provided.

23  Most of it was hearsay.  I think that, for one, if

24  Mr. Williams' statements would have been dug into a

25  little deeper, he had an argument or conflicting

1     agreement with the U.S. Marshal about whose mother was

2     living at my house.  Mr. Williams doesn't have any of the

3     scenarios correct.  He doesn't have any of the evidence

4     correct as to what took place, and it's just -- I know

5     that by my record from 1990 and 1992, I look terrible.

6     You know what?  I made some terrible mistakes.  I was

7     young.  And I'm not using this for an excuse.  Please,

8     don't take it that way.  I was on steroids.  I was a

9     young narcissistic young man, but that was half of my

10    life ago.  I got out in 1998, and I have not committed a

11    crime until I went out of state and -- to work to provide

12    for my children.

13        The issues that they wanted to bring up about the

14    incident with my ex-wife, my son's mom, that was a

15    reciprocal restraining order that the county did, because

16    she was at a shelter all -- trying to ensure that she was

17    not going to get deported, and I was given full custody

18    of my children.  I've never been violent with anybody

19    since 1992.

20        The thing that's important about that incident is

21    that the Court needs to understand and -- that Brenda

22    Giacco, my ex-girlfriend, my victim from 1992, I lived a

23    block and a half away from her, when I first got out, for

24    a year and a half.  We lived in Maple Valley for seven

25    years in -- in the same small town.  She wrote a letter

1    to be able to submit to the -- to the embassy to get my

2    children's mother -- her visa approved, stating that she

3    understands that sometimes people make bad mistakes, and

4    explained that she didn't fear me or that I posed a

5    threat to anybody else.

6         I filed multiple restraining orders against women in

7    Washington state when there was a problem with a

8    relationship ending that -- that I wanted to make sure

9    that it wasn't going to be exacerbated.  I've not been

10   violent with anybody.  I know that they want so badly,

11   because of mistakes that I made before, for me to be

12   guilty for this, but I already paid for my 1990 and 1992

13   crimes, and I proved for 13 years -- with a few traffic

14   tickets.  I got out on a Wednesday and went to work the

15   following Monday and worked the whole time, even in a bad

16   economy.

17        And all I did was I brought a woman here, and our

18   marriage did not work out, but there was no violence.

19   There was no domestic abuse.  There was nothing like

20   that.  She wanted to stay in America, and we got

21   divorced.  I got sole custody of my children.  My

22   children are everything to me.  They -- I can't explain

23   to you how much my children mean to me.

24        And this incident that took place in Vietnam, you

25   need to understand that you don't know everything that

1    took place and you -- all I did was protect my children.

2    I did not -- she was not in the condition that they found

3    her in when I left my house.  And without spreading a

4    whole bunch of facts that I've been advised not to go

5    into at this time, I don't know how to get you to

6    understand that there's clearly a third party involved in

7    this.

8         And I'm not trying to shift the blame.  I'm really

9    hoping that you're -- I'm taking responsibility by

10   admitting that they came into the house, and they

11   attacked us, and I -- and I protected my children.  That

12   was only after taking every single step to avoid this.

13   And -- and it was not anything on my part.  It was the

14   victim that was the one that was doing all the harassing,

15   that was sending the gangsters, that -- that stole my

16   money, that -- that had personal papers of mine, that --

17   there's no good reason at all for this person to have had

18   this, nor did I ever know that this person had this.  And

19   because she would not take no for an answer, that this

20   is -- this was what she ultimately did.  She wanted to

21   get out of Vietnam.

22        All I'm trying to do is explain that things work

23   completely different over there, and -- we don't have

24   gangsters here in America where I can have a problem with

25   somebody and say, "I'll give you $10 to go and do this to

1    this person," but it's clear that -- every Vietnamese

2    person that grew up there knows that that's the way that

3    it works, and it's --

4        I don't know what else to say without getting into

5    too many facts that I've been advised not to go into at

6    this time, but, you know -- I mean, I'm not -- I'm not

7    trying to shift the blame.  I'm taking responsibility for

8    what I did.  But I did not kill anyone and wrap them in a

9    blanket and stuff them in a storage unit, and -- and

10   there's not one piece of physical evidence that the

11   government has provided that hasn't proved that it's not

12   somebody else, just like I said it was.

13       And, again, I did everything I could to be able to

14   get investigation into the two women that knew this, and

15   the Vietnamese officer testified that he did not

16   investigate them, but yet I have evidence to the

17   contrary, that he was taken to that woman's house.

18            THE COURT:  Okay.  Thanks, Mr. Doran.

19       The matter is scored correctly by U.S. Probation as

20   an offense level 14, criminal history category two, which

21   yields a Guideline range of 18 to 24 months.

22       I came to the -- independent of Mr. Carroll, came to

23   a similar conclusion that one way to approach this is to

24   look at whether the criminal history is understated.  I

25   believe it is understated.  You have the non-countable

1    forgery conviction from the 1980's.  You have the

2    non-counted Assault in the Second Degree conviction and,

3    of course, we have this homicide conviction, which is not

4    fully adjudicated and countable.  So I do believe that a

5    departure to a criminal history category four is a good

6    starting point, which takes us to 27 to 33 months.

7        Then, I don't think the Court can use the homicide as

8    a departure, but the Court can use it for a variance

9    sentence.  And the difference between a departure and a

10   variance is set forth in the *Allen* case and in other

11   cases, but in terms of doing what is the appropriate

12   punishment, I look at the 3553 factors which, of course,

13   include the issue of the history and characteristics of

14   the Defendant, and the need to protect the public from

15   further crimes of this Defendant, and I do find that

16   Timothy Doran presents a clear and present danger to any

17   woman who he establishes a romantic relationship with.

18       On multiple occasions he's demonstrated remarkable

19   levels of violence and depravity aimed at women he claims

20   to love or cherish:  This felony assault on his first

21   wife, his violent and sadistic rape of his girlfriend,

22   and finally the vicious strangulation of his girlfriend

23   in Vietnam, followed by stuffing the body where he knew

24   it would not be found for a significant time.

25       All these events establish two things:  One, that his

1   criminal history category of two significantly

2   undercounts his prior criminal history and should be

3   readjusted to a category four and, secondly, on the 3553

4   factors, Mr. Doran presents a strong case for why a

5   longer sentence is needed to protect the public from

6   further crimes of the Defendant.

7       These offenses above and that we talked about here

8   show that the history and characteristics of Mr. Doran

9   demand a longer sentence than the Guideline range or even

10  the adjusted Guideline range.  Therefore, the Court goes

11  to the top of the adjusted range, 33 months, and triples

12  that sentence, for a total sentence of 99 months'

13  imprisonment.  This variance upward from 33 months has to

14  be looked at on a percentage basis, and it is 300

15  percent, and in a length-of-increase basis, and here that

16  is 66 months which, of course, is double the 33 months.

17      These increases are within reason given the case law

18  cited to me about how the Court can use an uncharged,

19  out-of-country homicide in conjunction with all the other

20  factors to craft a sentence that does not run afoul of

21  the legal restrictions of related to the offense of

22  conviction in these cited cases.  So, ultimately, the

23  Court determines that this 99-month term of imprisonment

24  is the reasonable sentence considering all aggravating

25  and mitigating circumstances, but is the absolute minimum

1    necessary to provide punishment which is sufficient but

2    not greater than necessary.

3        So, Mr. Doran, you are sentenced to a 99-month term

4    of imprisonment.  I will impose five years of supervised

5    release.  I believe that is the appropriate period of

6    time.  And you will be subject to standard conditions as

7    well as the following special conditions:  You will

8    cooperate in the collection of DNA.  You must not possess

9    any firearm or destructive device.  You will submit to

10   drug or alcohol testing, and you will participate as

11   instructed by U.S. Probation in any program approved by

12   Probation for treatment of narcotic addiction, drug

13   dependency or substance abuse, which will include

14   testing.  You must abstain from the use of alcohol and

15   all other intoxicants during supervision.  Your history

16   of abusing steroids is consistent with the need for

17   this -- these two testing and treatment conditions.

18       You will submit to search of your person, residence,

19   office, safe deposit box, storage unit, property or

20   vehicle, conducted in a reasonable time and manner by law

21   enforcement or Probation.  You will participate, as

22   directed, in the Moral Reconation Therapy program.  You

23   will also participate in any mental health treatment or

24   counseling program approved by Probation and contribute

25   to the cost of any programs to the extent that you're

1   financially able to do so.

2        I am not going to impose any specific sex offender

3   treatment requirements that would follow the conviction

4   of a sex offense, because this is not sex offense, and

5   this -- you are not the kind of person who is dangerous

6   to children, you are not the kind of person who is

7   dangerous to strangers like a Ted Bundy.  You are

8   dangerous to people who you establish a relationship with

9   and are a serial domestic abuser, and these conditions

10  simply don't relate to that at all.

11       So I think that -- is there anything else,

12  Mr. Werner, that you wanted on there that I didn't cover

13  one way or the other?

14            MR. WERNER:  Two issues, Your Honor.  We did not

15  want the financial information -- well, condition, and I

16  wasn't sure if the Court was going to strike that

17  condition.

18            THE COURT:  I did not impose that one, so we can

19  strike that one.

20            MR. WERNER:  What we did want, Your Honor, would

21  be conditions eight and nine from the Probation Office's

22  recommendation.  That's the fact making the -- his

23  compliance with SORNA a condition of supervised release,

24  and then number nine, as we briefly discussed, I do think

25  the Court should impose a sexual deviancy evaluation,

34

1    perhaps striking the physiological testing and the

2    requirement to turn over past mental health documents.

3            THE COURT:  Got it.

4        I will impose the condition that you are required

5    under the Sex Offender Registration and Notification Act

6    to comply with all the requirements of the Act, report

7    your address, where you will reside, and any subsequent

8    change of residence to Probation, register as a sex

9    offender in any jurisdiction where you reside, are

10   employed, or a student, and register in the jurisdiction

11   in which you were convicted, and must -- you must

12   register within three business days after your

13   sentencing -- or after your release from custody, I

14   should say, after serving this sentence.  I'm not going

15   to order the sexual deviancy evaluation, however.  I

16   don't believe that is required under the circumstances.

17       I will waive the fine for inability to pay.  There is

18   a $100 Special Assessment, which is due immediately.

19       Then, Mr. Carroll, are you recommending now the

20   Tucson facility instead of the Phoenix facility?

21           MR. CARROLL:  Yes, that's correct.

22           THE COURT:  Okay.  So I'll recommend FCI Tucson.

23       And then you had an issue about return of property.

24   I got your Motion seems like only in the last day or two.

25       Mr. Friedman, do you know anything about that?

```
1              MR. FRIEDMAN:  I do.  It was just filed

2    yesterday.  We have no objections, so we were -- I guess

3    if we could keep a slight window open.  We normally have

4    a week to answer.  I expect to file something tomorrow

5    saying we're fine returning --

6              THE COURT:  Okay.  I'm not sure -- obviously,

7    the Marshals have some, but some of it might still be

8    back in the Dakotas with the local police.  So we'll sort

9    it out, and anything that we have in the United States'

10   custody will be returned, and then beyond that, there's

11   not much we can do.

12             MR. FRIEDMAN:  And if I could just state that

13   almost certainly we'll file something saying that we

14   agree to that, but we just wanted to finish consulting.

15             THE COURT:  Right.  We'll wait for the

16   government's response in that area.

17        And was there anything else from the government that

18   I needed to address?

19             MR. WERNER:  Not from our perspective, Your

20   Honor.

21             THE COURT:  And, Mr. Carroll, did I cover the

22   things you wanted me to cover?

23             MR. CARROLL:  Yes, Your Honor.  I have one other

24   thing.  Mr. Doran will certainly appeal this.

25             THE COURT:  Yes.
```

1          MR. CARROLL:  And what I would ask, given his

2    statements, as I think were made clear to the Court, one

3    of the issues is going to be the effectiveness of his

4    counsel.  What I suggest is that the Court authorize CJA

5    to appoint counsel for appeal.  The Federal Defenders

6    will file the Notice of Appeal, clean up the return of

7    property issues, and then hand the case over to appellant

8    counsel with the Court's permission.

9          THE COURT:  Well, certainly, you know,

10   Mr. Doran, you have the right to appeal the sentence I've

11   imposed here today to the United States Court of Appeals,

12   and if you want to appeal, you must file that notice

13   within 14 days of today.  And if you can't afford the

14   cost of the appeal, the government will pay them for you.

15   And if you want an attorney for the appeal and cannot

16   afford one, the Court will appoint an attorney for you,

17   and the Clerk will assist you in preparing papers

18   necessary for your appeal.

19        So, Mr. Carroll, your proposal is spot on.  Stay with

20   the case until the Notice of Appeal is filed and the

21   property matter is dealt with, and then, you know, it

22   should be turned over to CJA counsel, and they'll take it

23   from there.

24          MR. CARROLL:  Thank you, Your Honor.

25        Your Honor, there's one other issue that I think I've

1    raised in my Sentencing Memo, is that Mr. Doran, although

2    you're recommending Tucson, he has a telephonic custody

3    hearing at the end of this month, and I don't know if

4    there's a way to delay his designation or transfer to

5    another facility until after that is done.

6        In my experience, and I think Mr. Doran understands

7    this too, once you're in transit with the BOP, that could

8    take a number of weeks, and the ability to make phone

9    calls and do things like that is really restricted.

10           THE COURT:  You know, I can't -- I'm not going

11   to interfere in the Bureau of Prisons' processing.  Their

12   considerations and their needs to move people on the

13   schedule that they determine is something that I'm simply

14   not privy to, so I don't want to impose any new

15   restrictions or problems for them, so I'm not going to

16   enter into that.  You can try the Bureau of Prisons on

17   that one.

18           MR. CARROLL:  And I've reviewed the Judgment.

19           THE COURT:  Sure.  You can hand it to Mr. Werner

20   and, Mr. Werner, you can approach.

21       Okay.  I've signed the Judgment in the case.  Thank

22   you, Counsel, for the excellent work through the years.

23   To Mr. Carroll and Mr. Stansell and the entire Public

24   Defender's office, you did a really fabulous job for

25   Mr. Doran, and I appreciate the quality of your work

38

1    every step of the way.

2         We'll be adjourned.  Thank you.

3              (End of Proceedings)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON)
                        ) ss.
3    County of King     )

4        I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6        That the foregoing verbatim transcript of

7    proceedings was transcribed under my direction; that the

8    transcript is a full, true and complete transcript of

9    the testimony of said witness, including all questions,

10   answers, objections, motions and exceptions;

11       That I am not a relative, employee, attorney or

12   counsel of any party to this action or relative or

13   employee of any such attorney or counsel, and that I am

14   not financially interested in the said action or the

15   outcome thereof;

16       That I am herewith securely sealing and digitally

17   signing this transcript and delivering the same via

18   electronic filing to the Clerk of the Court.

19       IN WITNESS WHEREOF, I have hereunto set my hand and

20   affixed my official seal this 10th day of October, 2014.

21

22

                     /S/ Leslie Waltzer
23                   Notary Public in and for the State
                     of Washington, residing at Issaquah
24

25